933 So.2d 111 (2006)
Frank R. MARIANO, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. 4D04-1852.
District Court of Appeal of Florida, Fourth District.
May 31, 2006.
Rehearing Denied August 3, 2006.
*113 Carey Haughwout, Public Defender, and Paul E. Petillo, Assistant Public Defender, West Palm Beach, for appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Daniel P. Hyndman, Assistant Attorney General, West Palm Beach, for appellee.
WARNER, J.
Appellant, Frank Mariano, Jr., appeals his conviction of one count of attempted second degree murder of his former girlfriend. Because the court erroneously (1) allowed impeachment of appellant on an irrelevant collateral matter and (2) admitted hearsay statements under the excited utterance exception to the hearsay rule, we reverse.
Around 4:30 a.m. on September 13, 2003, Deputies Brochu and Rice observed a vehicle drive by with the passenger door open. Brochu saw a female, whom he identified as Ann Schaab, Mariano's former girlfriend, waving and screaming, and trying to jump out of the vehicle. Brochu directed Rice to pursue the vehicle. Rice turned on the patrol car lights, and the vehicle pulled over. At that point, Brochu and Rice saw Mariano and Schaab struggling in the front seat. Brochu saw Mariano hitting Schaab.
The two deputies approached the vehicle and saw that Mariano was holding a knife. Brochu drew his gun and ordered Mariano to open his door. Mariano refused, and Brochu found that the door was locked. Brochu ordered Schaab to exit the vehicle, which she did. Brochu then broke the car window with his baton and opened the door. He ordered Mariano to drop the knife, which he immediately did. He then held Mariano at gun point while Rice talked with Schaab.
Deputies Porcelli and Siemer also arrived at the scene and assisted in removing Mariano from the car and handcuffing him. Mariano had a gaping cut on his neck and needed to be airlifted to the hospital.
Deputies Rice, Brochu, and Porcelli all testified that they spoke to Schaab at the scene at different times. All three deputies testified to the same explanation of events relayed to them by Schaab. She told them that while she was driving a drunken Mariano back to his residence, they got into an argument. Mariano took over driving the car and began looking for an isolated spot along the road, saying that if he could not have her, then no one would. He had a knife with him.
In addition, the state called Mariano's sister, Lorindo Chapman, who testified that a hysterical Schaab called her between 5:00 and 6:00 a.m. to tell her what had occurred. Schaab related the evening's events and told Chapman that Mariano tried to stab her and threatened to run her down. This was the only specific threat evidence introduced.
On the defense case, both Mariano and Schaab testified to a series of events that minimized Mariano's culpability. They explained that they had a twenty-year relationship, but prior to the incident in this case, they had separated. Schaab wanted the separation because she was dating someone else. On the evening of the incident, Mariano came over to Schaab's home. While he was there, Schaab's new boyfriend called. Mariano, who had been drinking, became very distraught and said that he was going to kill himself. Finally, Mariano asked Schaab to take him home, and she agreed.
While Schaab was driving, Mariano took out a knife and told Schaab that he was going to kill himself. He told her that if he could not have her, he did not want to live. At this point, Mariano wanted to *114 drive so Schaab climbed over him and let him drive. She then saw a police car and opened her door so that she could flag it down to try to prevent Mariano from killing himself. She testified that she yelled to the police, "he's [sic] got a knife, he's going to kill himself," but the police could not hear her.
Mariano and Schaab pulled over immediately when the police came behind them, and Schaab testified that she tried to open her door. At this point, Mariano reached over and shut the door because he did not want her to leave. When he reached over, the knife came close to Schaab and Schaab grabbed the knife, resulting in the cut to her two fingers. However, they both testified that he never pointed the knife at her. Additionally, they both denied that they were ever struggling in the car.
When Schaab was about to exit the vehicle, she looked over at Mariano and saw him slash his neck. Mariano testified that because he wanted to sit there and die, he did not open his door for the police. He wanted to kill himself to show Schaab his love. When the police did open the door, he immediately dropped the knife. Mariano did not recall speaking to the police at this point, but he did remember getting into the helicopter to be airlifted.
Mariano was convicted by the jury of attempted second degree murder with a weapon. He was sentenced to fifteen years in prison and to pay a $5,000 fine. He appeals his conviction and sentence.

Impeachment with Evidence of a Collateral Matter
During cross-examination of Mariano, the state asked him if he had threatened Schaab's new boyfriend, to which he responded that he did not recall doing so. The state was then allowed to impeach him by making him read to the jury letters that he wrote to Schaab after the incident. These contained statements that, "I fear for his safety in time;" "[i]n which case he will pay, whichever the case, he will pay;" "I would hunt him to the end of the earth;" "h[e] has no idea who or what I am;" and "I never quit." We conclude that it was error for the court to have permitted impeachment with this evidence involving a collateral matter.
Where a witness is cross-examined concerning a collateral or irrelevant matter, the examiner is bound by the answer and may not subsequently impeach the witness by introducing extrinsic evidence to impeach the witness on that point. Caruso v. State, 645 So.2d 389, 394 (Fla.1994). "The test is whether the proposed [impeachment] testimony can be admitted into evidence for any purpose independent of the contradictions. There are two types of evidence that pass this test: (1) facts relevant to a particular issue; and (2) facts which discredit a witness by pointing out the witness' bias, corruption, or lack of competency." Dupont v. State, 556 So.2d 457, 458 (Fla. 4th DCA 1990).
In Dupont, the defendant was charged with battery based on a fistfight. His defense was self-defense. On cross-examination Dupont denied verbally threatening the victim in an elevator during a court recess of the trial. The state then presented rebuttal testimony to prove that the elevator threat took place.
On appeal, we held that admission of the rebuttal testimony was error because it was irrelevant as it occurred several months after the fistfight. We determined that the testimony was not reputation testimony relating to his character for truthfulness, nor did it relate to any issue in the case, as the defendant had not put his character trait for violence in issue. We reversed, finding that the admission was harmful because the case hinged on the credibility of the defendant. Similarly, in *115 Gelabert v. State, 407 So.2d 1007 (Fla. 5th DCA 1981), the fifth district held that evidence of collateral matters was inadmissible and not harmless, because it was evidence of bad character and a propensity toward violence.
The state contends that because Mariano was charged with attempted first degree premeditated murder, it requires that the state prove premeditation, and this collateral evidence was relevant to premeditation. However, the cases it cites for the proposition that threats to the victim or to another are proper evidence to show motive and intent are distinguishable, because they involve threats made prior to the criminal act in question. See Wilchcombe v. State, 842 So.2d 198 (Fla. 3d DCA 2003); Brown v. State, 611 So.2d 540 (Fla. 3d DCA 1992).
The state further argues that the evidence of the threat against the boyfriend is admissible because the boyfriend was listed as a trial witness. However, "in order for evidence of a threat against a witness to be relevant, the threat must pertain to the witness's testifying about the crime or crimes for which the accused is standing trial." Ford v. State, 801 So.2d 318, 320 (Fla. 1st DCA 2001). "Without some link to the charges being tried, a general threat is not admissible to show consciousness of guilt." Id. The state presented no evidence as to what the boyfriend's testimony was going to be had he testified, which he did not, or that he had any knowledge of the incident. We reject the other contentions made by the state.
Just as in Dupont and Gelabert, this evidence was not harmless. See State v. DiGuilio, 491 So.2d 1129, 1139 (Fla.1986). It tended to impermissibly discredit Mariano based upon evidence of bad character or a propensity toward violence, both of which are inadmissible matters. See Gelabert, 407 So.2d at 1010-11. The defendant's case rested on the proposition that he was trying to kill only himself, not his girlfriend. This inadmissible evidence of a propensity for violence towards others cannot be considered harmless.

Excited Utterances
Over objection, the state introduced Schaab's statements to the deputies at the scene, as well as statements she made to Mariano's sister during an early morning phone call, as excited utterances, an exception to the hearsay rule. Section 90.803(2), Florida Statutes, provides:
(2) Excited utterance.  A statement or excited utterance relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.
This provision was interpreted in Stoll v. State, 762 So.2d 870, 873 (Fla.2000), to require three elements:
[I]n order for an excited utterance to be admissible, the following requirements must be met: (1) there must have been an event startling enough to cause nervous excitement; (2) the statement must have been made before there was time to contrive or misrepresent; and (3) the statement must have been made while the person was under the stress of excitement caused by the startling event.
As stated by Professor Ehrhardt, excited utterances partake of sufficient guarantees of truthfulness because "a person who is excited as a result of a startling event does not have the reflective capacity which is essential for conscious misrepresentation." Charles W. Ehrhardt, Florida Evidence § 803.2 (2003 ed.). Whether the necessary state of mind exists in the declarant to qualify the statement as an excited utterance is a preliminary fact for the court to determine pursuant to § 90.105, Florida Statutes, and the court's rulings are reviewed for an abuse of discretion. Cotton *116 v. State, 763 So.2d 437, 440-41 (Fla. 4th DCA 2000).
Generally, the most litigated element of the excited utterance factors is the time element. In State v. Jano, 524 So.2d 660 (Fla.1988), the supreme court noted, "`As long as the excited state of mind is present when the statement is made, the statement is admissible if it meets the other requirements of Section 90.803(2). This excited state may exist a substantial length of time after the event.'" Id. at 661 (quoting 1 C. Ehrhardt, Florida Evidence § 803.2 at 473-74 (2d ed.1984)). "`Perhaps an accurate rule of thumb might be that where the time interval between the event and the statement is long enough to permit reflective thought, the statement will be excluded in the absence of some proof that the declarant did not in fact engage in a reflective thought process.'" Id. at 662 (quoting E. Cleary, McCormick on Evidence § 297 at 856 (3d ed.1984)).
The supreme court discussed the time element again in Hutchinson v. State, 882 So.2d 943 (Fla.2004). In Hutchinson, in which the defendant was charged with first degree murder, a witness testified that on the night of the murder she spoke to one of the victims who told her that she had fought with the defendant that night. The trial court admitted this testimony as an excited utterance.
On appeal from the conviction and death sentence, the supreme court found that the time between the startling event, the fight, and the time of the phone conversation between the witness and the victim was not clear. The court stated that the only finding it could make was that the fight was probably between 7:00 and 7:30 p.m. and that without more information, the court could only speculate as to whether the victim engaged in reflective thought. Id. at 951. The court held that because the state failed to present evidence that the victim did not engage in reflective thought in the time period between the fight and the phone call, the victim's statement could not be admitted as an excited utterance, even though the time between the startling event and the statement may have been relatively short. Id. at 951-52. Thus, Hutchinson reinforces the proposition that it is the state's burden to prove that the declarant did not engage in reflective thought.
Moreover, the court also stated that the fact that the victim was still crying when the statement was made was not itself sufficient to demonstrate that she had not engaged in reflective thought. It cited with approval our statement in Charlot v. State, 679 So.2d 844, 845 (Fla. 4th DCA 1996), that "[a] statement as to what occurred does not become admissible merely because the victim is still in an excited state." Hutchinson, 882 So.2d at 952.
In Charlot, a police officer testified that when he arrived at a victim's house after a 9-1-1 call, she was frantic and hysterical. He was uncertain how long it took him to get the information from the victim but testified that he was in the apartment for about two hours. 679 So.2d at 845. We explained, as noted above, that the victim's excited state does not alone make the statement admissible. "`[I]f the supposed statement, exclamation, or spontaneous utterance takes the form of a narrative of a past event, it is very well established that it may not be considered as part of the transaction or res gestae.'" Id. (quoting Green v. State, 93 Fla. 1076, 113 So. 121, 123 (1927)).
In this case, Schaab called Chapman anywhere from thirty to ninety minutes after the event. By this time Schaab had been questioned by three deputies at the scene and related the events several times. Schaab was crying and hysterical *117 when she informed Chapman about the events of the evening. Chapman testified that Schaab said that Mariano had tried to kill her and would run her over if she got out of the car.
Applying the rule of Jano, the interval between the event and the statement to Chapman was long enough to permit reflective thought. Thus, the statement is inadmissible unless there is evidence that reflective thought did not occur. The mere fact that Schaab was still upset and crying is not sufficient to show that reflective thought has not occurred. See Hutchinson; Charlot. Further, the statement took the form of a narrative of the events, which in and of itself indicates that the victim is reflecting upon the events of the evening. Because the only evidence the state provided to support the admission of the statement was the victim's upset state, this was insufficient to warrant admission of the statement as an excited utterance.
The admission was not harmless, because Chapman testified that Schaab told her of specific threats that Mariano made to her, including that Mariano tried to stab her in the car and that he would run her down if she got out of the car. These specific threats were not harmless beyond a reasonable doubt. They went beyond the statements relayed by the officers and were inconsistent with Schaab's trial testimony. Thus, they should not be admitted in a new trial.
Three deputies also testified to statements Schaab made to them at the scene. Mariano objected to Schaab's statements to Deputy Brochu as hearsay, but the trial court admitted the testimony under the excited utterance exception. However, similar testimony given by Deputies Rice and Porcelli was not objected to at trial.
Deputy Brochu testified that he spoke to Schaab about ten minutes after he and Rice stopped the vehicle. She was very concerned, upset, and was shaking. Over objection, Brochu testified to the narrative that Schaab gave to him.
She stated that she was at her residence in Jensen Beach, Martin County, Florida when the male, the driver, Mr. Frank Mariano came over to her house. He had been drinking. They had a discussion about their children. They had children together and had lived together in the past. That . . .
Mariano objected again, contending that this was a "dialogue." The court again overruled the objection, and Brochu continued:
That they got into an argument. That she was going to drive back to his residence in Port St. Lucie. As they were driving, they got into an argument. He took over driving the car and started looking for an isolated spot along Baker Road. He made statements that he wanted her to go with him. That if he could not have her, no one would. Along those lines.
This statement was merely a narrative of past events. In the recent case of J.A.S. v. State, 920 So.2d 759 (Fla. 2d DCA 2006), the deputy interviewed a father about an altercation with his son shortly after its occurrence. The second district, relying on Charlot, noted:
A narrative of a past event is generally not considered a spontaneous statement, Charlot v. State, 679 So.2d 844, 845 (Fla. 4th DCA 1996) (citing Green v. State, 93 Fla. 1076, 113 So. 121, 123 (1927)), nor is a statement in reply to questions from law enforcement, Blandenburg, 890 So.2d [267] at 272. Here, the father answered the deputy's questions about how he had been injured. This was not a case in which the victim blurted out *118 the details of a traumatic event without prompting. See, e.g., Rivera v. State, 718 So.2d 856 (Fla. 4th DCA 1998) (holding that excited utterance was proven when evidence showed that a patrol officer saw the victim screaming and waiving her hands; when he approached, she was crying, her dress was ripped, and she asked the officer to keep the defendant away from her).
Id. at 763. Similarly, there is no evidence that Schaab blurted out statements. Instead, she was merely responding to the deputy's attempt to get information regarding what had occurred. She was explaining events earlier in the evening leading up to the incident in the car, not just a description of what occurred in the car.
Again, it is the state's burden to show that the statement is an excited utterance. The state does not do this merely by showing that the statement was made close to the startling event and the declarant was upset. The deputy testified that the statements made by Schaab were prompted by his questioning. On this record, the court abused its discretion in admitting Brochu's testimony regarding Schaab's statement. See J.A.S.; Charlot.
We need not address the testimony of the other two deputies, as Mariano did not object to their testimony based upon the excited utterance exception. Even though Mariano's objection to Deputy Brochu's statement was overruled, it did not mean that his objection to the other statements would be futile. The application of the excited utterance exception is specific to each statement. Had he objected to the statements of the other deputies, the court may have found that these later statements were made too late and with time for Schaab to reflect. It could have also found that these clearly were narrative statements. We therefore do not address them as the issue was not preserved.
Because of the erroneous admission of improper collateral evidence as impeachment and the admission of hearsay evidence which did not qualify as excited utterances, we reverse Mariano's conviction and sentence and remand for a new trial.
KLEIN, J. and BAILEY, JENNIFER D., Associate Judge, concur.