957 So.2d 560 (2007)
Robert Shannon WALKER, II, Appellant,
v.
STATE of Florida, Appellee.
No. SC04-2381.
Supreme Court of Florida.
May 3, 2007.
*564 Baya Harrison, Monticello, Florida, for Appellant.
Bill McCollum, Attorney General, Tallahassee, Florida and Barbara C. Davis, Assistant Attorney General, Daytona Beach, Florida, for Appellee.
PER CURIAM.
Robert Shannon Walker, II appeals his 2004 convictions and death sentence for the assault, kidnapping, and murder of David Hamman. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm Walker's convictions and death sentence.

*565 FACTUAL AND PROCEDURAL BACKGROUND
This case involves the drug-related beating, torture, kidnapping, and ultimate execution of David Hamman at the hands of Robert Shannon Walker, II. The evidence presented during Walker's trial revealed the following facts.
In the late evening hours of January 26, 2003, the victim, David "Opie" Hamman, arrived at the second-floor apartment of Joel Gibson in the city of Palm Bay, located in Brevard County, Florida. Accompanying Hamman were two women, Leslie Ritter and Hamman's girlfriend, Loriann Gibson.[1] The appellant, Robert Shannon Walker, II, was waiting inside the apartment with his girlfriend, Leigh Valorie Ford, and Joel Gibson.
Immediately after Hamman entered Joel's apartment, Walker and Ford viciously attacked Hamman, beating him with various objects including the head of a metal Maglite flashlight, a baton type weapon, and a blackjack. Although not actively participating, Joel seemed to be supervising the attack. The attack on Hamman was drug-related.[2] About a half hour into the attack, Joel, Walker, and Ford forced Hamman to strip down to only his socks to ensure he was not wearing a wire because they suspected that Hamman was a Drug Enforcement Administration (DEA) agent.[3] They also forced Ritter and Loriann Gibson to strip down to their underwear in order to check for wires but permitted the women to redress.
After being searched, the women went to the back bedroom. They last saw Hamman lying on a bloody sheet on the living room floor, naked, with one of his eyes halfway hanging out. There was blood all over the apartment. From the back bedroom, the women heard Walker and Ford asking Hamman, "Are you ready to die?" and heard Joel saying Hamman was going to die that night. They also heard Hamman plead for his life and scream, "Please, stop, I don't want to die. Please don't kill me. It hurts."
The attack on Hamman at Joel's apartment lasted between two and three hours. Sometime around midnight, Hamman tried to escape.[4] While Walker and Ford were *566 distracted, Hamman ran out of the apartment and made his way down the stairs, leaving a trail of blood behind him. When Walker and Ford discovered Hamman had escaped, Ford said, "Get the bag and stuff and put them in the trunk," and "get the tarp and lay it in the trunk." Hamman made it a short distance down the road leading away from Joel's apartment before being caught by Walker and Ford. He had left drops of blood on the parking lot and the road at the point where Walker and Ford caught him, near the apartment mailboxes.[5]
Walker and Ford put the tarp in the trunk of Ford's automobile and forced Hamman to get in. Walker told Ford to find a remote spot to take Hamman. Ford drove her car with Hamman in the trunk, and Walker drove Hamman's pickup truck. On the way, they stopped at the house of Joel Gibson's girlfriend, Lisa Protz. Protz saw that Walker had a gun. Walker asked Protz for gasoline, rope, and tape, but she only gave him tape. A few minutes later, Ford arrived, and not long after that, Joel called on Protz's phone. While talking to Joel, Walker wrapped the tape around his fingers.
Walker and Ford then left and drove to a remote area down a dirt road just outside the gates to the Tom Lawton Recreation Area, a state park. At some point between Joel Gibson's apartment and the park, Hamman's hands were bound behind his back with a plastic cable tie. Just outside the park gates, Hamman was taken out of the trunk and forced to lie down with his back on the ground. Walker then shot Hamman six times in the face with a Llama .45 pistol. Walker left Hamman on the road and drove back to Joel Gibson's apartment.[6]
At Joel Gibson's apartment, Walker asked Ritter and Loriann Gibson to take him to Georgia. They obliged Walker, and the three drove north on Interstate 95 in Hamman's truck, with Loriann at the wheel.[7] When they reached Jacksonville, instead of continuing to head north to Georgia, Loriann turned onto Interstate 10. When they reached Live Oak, Walker had Loriann exit and pull into a gas station so he could purchase a map. When Walker exited the truck without the keys and, incidentally, his shoes, Gibson drove away. Walker was later found barefoot and crying at the gas station by a "Good Samaritan," William Davis. Mr. Davis purchased shoes for Walker and took Walker to the bus station where he gave Walker money for a bus ticket.
In the meantime, Loriann and Ritter drove back to Interstate 10 and found Officer Bobby Boren, who was running radar for the Department of Transportation in a marked vehicle. Loriann and Ritter frantically relayed the events of the previous night and their escape from Walker that morning. Officer Boren then requested back-up from the Live Oak city police and the Suwannee County Sheriff's office. When back-up arrived, a "be on the lookout" (BOLO) was issued for a possible murder suspect matching Walker's description. The Suwannee County Sheriff's office also contacted Brevard County police to advise that they were holding *567 possible witnesses to a murder in Brevard County the night before.
Brevard County officers were already at the crime scene when they received the call from Suwannee County. Hamman's body was discovered earlier that morning, just before 6 a.m., by Steven Roeske of the St. Johns River Water Management District on the road outside the gates to the Tom Lawton Recreation Area. Hamman was found lying face up in a pool of blood, halfway on and halfway off the road. His hands were bound behind his back, and he was totally naked with the exception of the socks on his feet. Just before noon, Brevard County Sheriff's agents Alex Herrera and Lou Heyn left for Live Oak to interview Ritter and Loriann. A few hours earlier, sometime between 9 and 10 a.m., Walker was apprehended at the Live Oak bus station by Live Oak Police Officer Charles Tompkins and Suwannee County Deputy, Corporal David Manning.[8] Walker was taken directly to the county jail. Agents Herrera and Heyn arrived in Live Oak later that afternoon and interviewed Loriann and Ritter. Sometime after 7 p.m., the agents interviewed Walker.
After waiving his Miranda[9] rights and signing a waiver-of-rights form, Walker gave a taped statement to Agents Herrera and Heyn in which he confessed to beating, kidnapping, and shooting David Hamman. Walker admitted to beating Hamman with a Maglite flashlight when Hamman arrived at Joel's apartment but claimed that they mainly argued. Walker said that he made Hamman sit on the couch and questioned Hamman about being wired and about being a "cop." He told Hamman to strip, and Hamman complied. Walker claimed that he hit Hamman only three to four more times before Hamman ran naked from the apartment. Walker explained he "just wanted to slap the piss out of [Hamman] because he scared me."
Walker also admitted to chasing Hamman down and taking him for a ride in the trunk of Ford's car, but claimed that Hamman got in and out of the trunk on his own. Walker claimed that when they arrived outside the state park, Hamman told Walker that he knew the address of Walker's parents and was going to rape Walker's mother while he videotaped it.[10] Walker then admitted to binding Hamman's hands and shooting Hamman with the Llama .45. Walker said that Hamman's body was lying face up beside the truck at the time he was shot. Walker said that he only meant to scare Hamman and humiliate him by driving him out to a remote location and forcing him to walk back naked. He explained that he only killed Hamman after Hamman scared him by making threats to harm his family. After that, Walker confirmed that he went back to Joel Gibson's apartment and asked Ritter and Loriann Gibson to take him for a ride in Hamman's truck. When they stopped in Live Oak, the women left Walker at the gas station.
Hamman's truck was impounded, photographed, and searched. Two .45 caliber semiautomatic pistols were recovered from the glove compartment. One was a Llama .45 caliber with a bullet in the chamber. Near the passenger seat on the floorboard of the truck was a black backpack containing flex ties, a magazine with three cartridges, loose cartridges, and a box of ammunition. *568 Also in the truck was a blue Rubbermaid container which held flex ties, a folding knife, a leather blackjack, two magazines with cartridges, a Maglite flashlight, and one loose cartridge. There were reddish-brown stains on the driver's side and armrest of the truck, and there was pattern stain all the way down the driver's side on the outside of the truck.
On February 25, 2003, Walker was indicted on three counts: (1) first-degree murder, (2) kidnapping, and (3) aggravated battery. Before trial, Walker filed various pretrial motions, including a motion to suppress his statement to the Brevard County officers and motions to declare Florida's capital sentencing scheme unconstitutional. All of these motions were denied.
Walker's jury trial began on July 21, 2004. At trial, the jury heard the testimony of Loriann Gibson, Ritter, Goss, Protz, and the various officers involved, as well as Walker's taped statement in which he confessed to shooting Hamman. In addition, the State presented the testimony of the medical examiner, Dr. Sajid Quaiser, the firearms examiner who tested the Llama .45, and a DNA expert.[11] Dr. Quaiser testified that Hamman suffered multiple blunt-force injuries and multiple gunshot wounds. Hamman's body showed blunt-force injuries on the head, back of the hands, forearms, legs, chest, back, hip, feet, knees, and thighs. Hamman also suffered lacerations to the scalp, forehead, and eyebrows. Hamman's torso was bruised, which Dr. Quaiser attributed to the use of a baton, rod, or hard stick. In addition to these blunt-force injuries, Dr. Quaiser testified that there were six gunshot wounds to Hamman's face which caused diffuse brain hemorrhaging, and at least two of the gunshots were fired at close range. In Dr. Quaiser's opinion, Hamman's death was most likely caused by the gunshot wounds.[12]
Dr. Quaiser also found that Hamman's body manifested multiple signs of torture. Hamman had abrasion lines under the chin around the throat, indicating that at some point a ligature was applied and that Hamman had been strangled. Abrasions on Hamman's left thigh indicated that his body was dragged on a hard surface such as a road. Abrasions to his knees indicated that Hamman had been kneeling on a hard surface like a road, and there were also multiple abrasions to his feet. Dr. Quaiser also found defensive wounds: Hamman's upper right arm was fractured, he had multiple abrasions on his right forearm, and he had wounds on his hands, knuckles, and wrists.[13]
In addition, the firearms expert testified that one of the six projectiles recovered from Hamman's head at the autopsy definitively matched the Llama .45, and three others had characteristics consistent with being fired from the Llama .45.[14] He also *569 testified that the cartridges found in the black backpack and in Walker's pockets could be used in the Llama .45. He further stated that the Llama .45 requires the user to methodically target and aim the gun between each shot.
On July 27, 2004, the jury returned its verdict finding Walker guilty on all three counts. Following the penalty phase, the jury recommended death by a vote of seven to five. After conducting a Spencer[15] hearing, the trial court found three aggravating factors,[16] no statutory mitigators, and four nonstatutory mitigators.[17] On December 13, 2004, the trial court sentenced Walker to death. This appeal followed.

ISSUES ON APPEAL
Walker raises seven issues in this appeal: (1) whether the trial court erred in denying Walker's motion to suppress his statement to Brevard County law enforcement officers on the grounds that his statement was involuntary; (2) whether the trial court erred in denying Walker's motion to declare Florida's capital sentencing scheme, section 921.141, Florida Statutes (2004), unconstitutional because a judge rather than a unanimous jury determines death penalty aggravators; (3) whether the trial court committed reversible error when it denied Walker's motion for judgment of acquittal because the State's circumstantial evidence case was insufficient to rebut Walker's reasonable hypothesis of innocence as to the murder count; (4) whether the trial court committed reversible error in weighing the aggravating and mitigating factors; (5) whether the trial court abused its discretion by admitting photographic evidence which was either irrelevant or gruesome and unduly prejudicial; (6) whether the trial court committed reversible error and denied Walker's due process rights when it denied Walker's motion for a statement of particulars regarding the aggravating circumstances and the State's theory of prosecution; and (7) whether the trial court committed reversible error under Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), by denying Walker's motion for findings of facts by the jury in a special verdict form. In addition, we also consider whether Walker's death sentence is proportionate.
At the outset, we summarily deny claims (5), (6), and (7). We deny claim (5) because, after fully examining this record, we find that the trial court did not abuse its discretion in admitting photographic evidence marked as State's exhibits 50 through 54, 75, and 80 through 89.[18] Further, *570 we deny claims (6) and (7) because we find that these claims are without merit.[19] Thus, in the analysis that follows, we limit our discussion to Walker's remaining claims. Ultimately, we affirm Walker's convictions and death sentence.

1. Motion to Suppress Walker's Statement
On January 8, 2004, Walker filed his motion to suppress his January 27, 2003, statement to Brevard County Sheriff's Agents Herrera and Heyn. Walker essentially alleged three grounds upon which his statement should be suppressed: (1) he was illegally detained;[20] (2) his statement was taken in violation of his Miranda rights after he had already invoked the right to counsel; and (3) his statement was not made voluntarily because he was under the influence of mind-altering drugs which aggravated his preexisting bipolar condition. Following a hearing, the trial court denied Walker's motion, finding that Walker had "initiated further conversation [with law enforcement officers] knowingly and intelligently under the totality of the circumstances" and that the weight of the evidence demonstrated that Walker was not under the influence at the time he waived his Miranda rights and gave his statement to police.
Walker claims that the trial court committed reversible error by denying his motion to suppress his statement to the Brevard County agents. Specifically, Walker disputes the trial court's findings that he did not ask for an attorney prior to being interviewed by the Brevard County agents and the trial court's finding that his statement was given voluntarily in light of the evidence of his drug use and bipolar disorder.
As explained below, we affirm the trial court's denial of Walker's motion to suppress. In so doing, (a) we detail the evidence presented to the trial court at the hearing on the motion to suppress upon which the trial court based its findings. We then (b) set out the standard of review we apply, and (c) apply this standard of review to Walker's claim.

(a) Hearing on Motion to Suppress
The hearing on Walker's motion to suppress was held on May 28, June 18, and July 6, 2004. The State called most of the law enforcement officials who had contact in Suwannee County with either Ritter and Loriann Gibson or Walker.[21] Officer Tompkins and Corporal Manning were the first to have contact with Walker. Officer Tompkins responded to the BOLO on Walker, tracking Walker from the Penn Oil gas station to Wal-Mart and ultimately to the Live Oak bus station, where he apprehended Walker. Corporal Manning also responded to the bus station where he *571 secured Walker and found a knife, two .45 caliber magazines, and a blackjack on Walker during a pat-down search. Both Officer Tompkins and Corporal Manning testified that Walker did not ask for an attorney at the time of his arrest and that the only thing Walker said was, "Just shoot me. I can run and you can just shoot me." Officer Tompkins testified that apart from asking Walker his name, he did not ask Walker any questions and did not advise Walker of his Miranda rights. He also testified that during the approximate ten-minute ride to jail, Walker did not request an attorney. Regarding Walker's behavior at the bus station, Corporal Manning testified that although Walker was cooperative, he would go from being very agitated to very calm and was exhibiting the same behavior as someone who was under the influence of methamphetamines.
In addition, upon hearing that Walker had been detained, Live Oak Police Lieutenant Williams responded to the bus station. Lieutenant Williams also testified that Walker did not ask for an attorney.[22] Regarding Walker's behavior, Lieutenant Williams stated that Walker may "have been under the influence of some kind of drug." He recalled that Walker acted strangely and aggressively, telling the officers to "just shoot me. I want out of this life."
Later that evening, Agents Heyn and Herrera interviewed Walker in a conference room at the jail. After Agent Herrera introduced himself and asked to interview Walker, the agents testified that Walker responded, "I think I may need a lawyer." Upon hearing this, they testified that they began to collect their jackets to leave, but Walker stopped Agent Herrera and said, "You guys didn't get all dressed up and prettied up to come up here for nothing, let me think." They testified that Walker asked Agent Herrera if he needed legal counsel, and Agent Herrera told him they could not give that advice. Walker said he wanted to think further before an interview. Agent Herrera testified that he then explained to Walker that he did not have to talk to them, and he read Walker his Miranda rights. He also told Walker that he was "99.999 percent sure" an attorney would tell Walker not to talk to anyone. The agents testified that Walker said he thought it would be in his best interest to talk to them, and he signed the Miranda waiver-of-rights form.[23]
Although both agents had recorders, neither agent recorded the foregoing discussion and administration of the Miranda rights. The agents explained that they did not record because Walker was trying to decide whether to allow recording. After Walker decided to waive his Miranda rights and give an interview to the agents, he also agreed to allow recording.[24] The State presented Walker's taped statement in which he confessed to shooting Hamman to the trial court.
As memorialized in the statement taped by Agent Herrera, the interview commenced around 7:40 p.m. and lasted approximately *572 one hour. At several points throughout the interview, Walker stopped the recording because he needed a break, either because he had become emotional or because he needed to gather his thoughts. Each time recording recommenced, Walker affirmed that there were no threats or promises made to him in exchange for his statement. Walker never indicated that he wanted to discontinue the interview.[25] At the conclusion of the interview, Walker affirmed that he had waived his Miranda rights prior to speaking with the agents.
Both agents testified that Walker did not appear to be under the influence of drugs at the time of the interview. He was coherent, relaxed, and in control of his emotions. He "seemed like a man who had something on his mind and he was trying to decide if he wanted to tell his side of the story."
The defense called Leslie Ritter to testify regarding Walker's drug use. She first met Walker at Joel Gibson's apartment but did not see Walker consume any controlled substances there. However, before they left for Georgia, she did see Joel Gibson give Walker some cocaine and "crank." She also recalled seeing Walker snorting something on the way to Jacksonville, and she believed that Walker was high when she and Loriann abandoned him in Live Oak.
The defense also called Dr. Howard Bernstein, a forensic psychologist who interviewed Walker and reviewed his jail records. Dr. Bernstein first met Walker on June 14, 2004. Based on his interview with Walker, Dr. Bernstein testified that Walker was under the influence of drugs on January 27, 2003. Walker told Dr. Bernstein that he had been on a seven-day binge of drugs, using Methedrine, cocaine, and pills, and slept only two to three hours each night. Walker told Dr. Bernstein that, right before his arrest, he "had a last hit of dope." Thus, although Walker was arrested between 9 and 10 a.m., Dr. Bernstein testified that because the drugs Walker ingested are "long-lasting central nervous system stimulants," Walker would have been under their influence when the interview began with the Brevard County agents later that evening. Based on the jail records, Dr. Bernstein further testified that Walker had been diagnosed with depression and was prescribed psychiatric medicine for depression, anxiety, and sleep disorder while in the Suwannee County jail. He testified that Walker had also been diagnosed with a bipolar disorder with psychotic features[26] and testified that Walker's preexisting bipolar disorder magnified the effect of the drugs Walker ingested. Thus, in Dr. Bernstein's opinion, Walker's statement to Brevard County agents was "less than voluntary knowing somewhat [sic] uncoerced." He conceded that his opinion was "wishy washy, and somewhat less than intelligent" but explained that "that's all I have because I have not listened to the tapes or read the transcripts" of Walker's interview. On *573 cross-examination, Dr. Bernstein clarified that Walker may have felt coerced based on a past experience where he was allegedly beaten by Virginia law enforcement officers during a prior arrest.
Walker also testified at the hearing. Walker testified that on the drive from Brevard to Suwannee County, he was "smoking meth, and eating pills of meth, and doing cocaine, and rolling marijuana up and smoking that." He said that he had been following the same routine for about seven days and would stay awake for a day or two then get an hour or two of sleep.
Regarding his request for an attorney, Walker testified that after he was arrested, he asked for his lawyer. He stated that he had been in the penitentiary three years and knew not to say anything. He testified that when Suwannee County and Live Oak officers tried to talk to him, he again asked for a lawyer; and when Agents Heyn and Herrera came to talk to him, he asked for a lawyer a third time. Walker testified that the agents kept telling him that it was in his best interest to talk to them and that they "didn't drive up here for nothing." He said that the agents never got up to walk out after he asked for an attorney, and he never made the statement about them coming all that way for nothing. Walker testified that he remembered signing the Miranda waiver-of-rights form but stated that he did not know "what it was for." Furthermore, he testified that he was afraid of the agents because of the beating he had received in Virginia and that although the agents were not wearing guns, he felt intimidated.

(b) Standard of Review
In reviewing the trial court's findings on a motion to suppress, this Court has stated:
"[A] trial court's ruling on a motion to suppress comes to us clothed with a presumption of correctness and, as the reviewing court, we must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court's ruling." Connor v. State, 803 So.2d 598, 605 (Fla.2001) (quoting Murray v. State, 692 So.2d 157, 159 (Fla. 1997)). Nevertheless, "mixed questions of law and fact that ultimately determine constitutional rights should be reviewed by appellate courts using a two-step approach, deferring to the trial court on questions of historical fact but conducting a de novo review of the constitutional issue." Id.

. . . .
This Court "recognize[s] and honor[s] the trial court's superior vantage point in assessing the credibility of witnesses and in making findings of fact. The deference that appellate courts afford findings of fact based on competent, substantial evidence is an important principle of appellate review. In many instances, the trial court is in a superior position `to evaluate and weigh the testimony and evidence based upon its observation of the bearing, demeanor, and credibility of the witnesses.'" Stephens v. State, 748 So.2d 1028, 1034 (Fla.1999) (quoting Shaw v. Shaw, 334 So.2d 13, 16 (Fla.1976)).
Taylor v. State, 937 So.2d 590, 598-99 (Fla.2006) (holding that trial court did not err in denying a motion to suppress based on claim that defendant did not voluntarily consent to search of his motel room).

(c) Analysis

(i) Request for Counsel
First, Walker argues that he unequivocally requested counsel both at the time he was taken into custody by Suwannee County and Live Oak law enforcement *574 officers and before he was interrogated by Brevard County law enforcement officers. In rejecting this argument, the trial court made the following findings of fact and legal conclusions:
Next, Defendant claims that he was denied his Fifth and Sixth Amendment right to an attorney before he made any statements. As to the Suwannee County Officers, he made no statement as a result of interrogation by the police even though he was in custody. Statements he made were limited to his identification and "if I run, will you shoot me" or something similar. Defendant claims he made requests for an attorney to the Suwannee County and Live Oak Officers but there is no evidence of that other than Defendant's claim. He was not interrogated by those officers in any event and the right to have an attorney present was not an issue as he was not being questioned. This claim is without merit.
Third, Defendant claims he invoked his right to have a lawyer present before talking with Agents Heyn and Herrera from Brevard County. After introducing Agent Heyn and himself, Agent Herrera informed Defendant of why they wished to talk with him. Defendant responded "I think I might want to talk to an attorney." This was an equivocal response and the Agents could have continued without violating Defendant's rights. See State v. Owen, 696 So.2d 715 (Fla.1997) and Walker v. State, 707 So.2d 300 (Fla.1997). Nonetheless, the Agents got up from the table, started to put on their jackets preparing to leave. The Defendant then initiated contact with the Agents and stated words to the effect, "hey, you didn't get all dressed up and pretty and drive all the way over here for just two minutes, hold on, sit down and let me think." Agent Herrera explained his rights and told him that if he had an attorney, the attorney would most likely 99.999% tell him not to say a word. Defendant questioned the detectives for their advice on an attorney and they told him they could not give him advice. He then was read his [Miranda] rights and executed a standard Miranda form indicating that he was aware of his rights and wished to proceed to talk to them. This claim is without merit as he initiated further conversation and waived his right to counsel and silence knowingly and intelligently under the totality of the circumstances See Edwards v. Arizona, 451 U.S. 477[, 101 S.Ct. 1880, 68 L.Ed.2d 378] (1981); Oregon v. Bradshaw, 462 U.S. 1039[, 103 S.Ct. 2830, 77 L.Ed.2d 405] (1983); Sapp v. State, 690 So.2d 581 (Fla.1997); Lukehart v. State, 762 So.2d 482 (Fla.2000); Jennings v. State, 718 So.2d 144 (Fla.1998).
The trial court's findings of fact, namely that Walker was in custody but never made an unequivocal request for an attorney, are supported by competent, substantial evidence. Based upon these, we conclude that Walker was not denied his constitutional right to counsel. Accordingly, we affirm the trial court's denial of Walker's motion to suppress upon these grounds.

(ii) Voluntariness of Confession
Walker also claims that the trial court erred in denying his motion to suppress based on its finding that his statement to Agents Herrera and Heyn was voluntarily given. He argues that the State did not meet its burden of proving that his statement was given voluntarily in light of the evidence presented at the hearing showing that he was still under the influence of cocaine and methamphetamines which aggravated a preexisting bipolar condition.
*575 The trial court denied Walker's claim that his statement was not voluntary under the totality of the circumstances based on the following findings:
Lastly, Defendant claims he was under the influence of illegal narcotic drugs to the extent that his statements were involuntarily made. There was testimony by the two females who drove him from Brevard County to Suwannee County that he was doing drugs all the way during the drive. Defendant asserted that he had been on a 7 day drug binge and continued using drugs during the drive. When he was detained early in the morning, 9 am10 am, the Suwannee County Officers observed conduct consistent with being under the influence. However, it was 8 to 10 hours after he was detained before the Brevard county Agents questioned him. He showed no sign of drug influence at that time. It was only his own testimony [that] indicated he was under the influence at that time. Dr. Howard Bernstein was called as a witness on Defendant's behalf and rendered a rather strange opinion. His sole basis for his opinion was what Defendant had told him. Dr. Bernstein gave an unusual self-defeating opinion actually not stating that Defendant's statements were not voluntarily given. Defendant's emotional statements and conduct during the Mirandized interview are not uncommon for someone just detained on a first-degree murder charge. Further, there was insufficient evidence as to the exact drugs used or the amount. Based upon the totality of the circumstances, the court finds that Defendant's statements were knowingly and voluntarily made.
The trial court's findings are supported by competent, substantial evidence. Moreover, as the State correctly points out, a very similar claim was rejected in Orme v. State, 677 So.2d 258 (Fla.1996). In Orme, the defendant claimed that his "statements to officers should have been suppressed on grounds he was too intoxicated with drugs to knowingly and voluntarily waive his right to silence." Id. at 262. In rejecting this claim, this Court stated:
While we acknowledge there is conflicting evidence in the record on this point, we nevertheless are limited in this appeal by the applicable standard of review. Our duty on appeal is to review the record in the light most favorable to the prevailing theory and to sustain that theory if it is supported by competent substantial evidence. Johnson v. State, 660 So.2d 637, 641 (Fla.1995), cert. denied, 517 U.S. 1159, 116 S.Ct. 1550, 134 L.Ed.2d 653 (1996). Here, friends and family members supported the defense's theory that Orme was severely intoxicated at the times in question. However, the officers who actually took Orme's statements testified that he was coherent and responsive. Moreover, the statements were taped, and the trial court after reviewing these tapes concluded that the evidence supported the state's theory. Because there is competent substantial evidence supporting this conclusion, we may not reverse it on appeal. Id.

Id. at 262-63.
Similarly, while there is some evidence that Walker was under the influence of drugs, likely methamphetamine and cocaine, at the time of his arrest, the officers who actually took Walker's statement testified that Walker appeared coherent and forthcoming in his responses. Moreover, as in Orme, Walker's statement was taped and was played at the evidentiary hearing. After reviewing the recorded statement along with the other evidence presented at the hearing, the trial court concluded that *576 the evidence supported the State's theory. Specifically, the trial court found that somewhere between eight and ten hours passed before Walker gave his statement to Agents Herrera and Heyn.[27] Moreover, Walker signed a Miranda waiver-of-rights form and affirmed in his taped statement that he had been read his Miranda rights and signed the waiver prior to giving his statement.
Based on the foregoing, we conclude that there is competent, substantial evidence to support the trial court's conclusion that Walker made a knowing, voluntary, and intelligent decision to waive his Miranda rights and give his statement to police. Orme, 677 So.2d at 263; see also Traylor v. State, 596 So.2d 957, 966 (Fla. 1992) (finding that Florida's constitution requires the same warnings as those mandated by Miranda). "Because there is competent substantial evidence supporting [the trial court's] conclusion, we may not reverse it on appeal." Orme, 677 So.2d at 263. Accordingly, we affirm the trial court's denial of Walker's motion to suppress.

2. Constitutionality of Florida's Capital Sentencing Scheme
Walker claims that Florida's capital sentencing scheme, section 921.141, Florida Statutes (2004), is unconstitutional under Apprendi and Ring because it allows a judge rather than a unanimous jury to sentence a capital defendant to death. This claim is without merit. Ring does not apply to the facts of this case because the "course of a felony" aggravator based on Walker's conviction of kidnapping, resting on a unanimous guilt-phase verdict, is present. See Troy v. State, 948 So.2d 635, 653 (Fla.2006) (denying Ring relief because the trial court found the "course of a felony aggravator" based on the jury's verdict finding defendant guilty of two counts of armed burglary, two counts of armed robbery, and attempted sexual battery in addition to first-degree murder); Robinson v. State, 865 So.2d 1259, 1265 (Fla. 2004) ("This Court has held that the aggravator[] of murder committed `during the course of a felony' . . . [was] already submitted to a jury during trial and, hence, [is] in compliance with Ring.").[28] We also note that the jury found the defendant guilty of first-degree murder solely on a premeditation theory, precluding any overlap between the elements of the murder conviction and the aggravator. See generally Blanco v. State, 706 So.2d 7, 11 (Fla. 1997).

3. Sufficiency of State's Evidence
Walker claims that the trial court erred when it failed to grant his motion for acquittal, because the evidence presented by the State was circumstantial and insufficient to rebut Walker's reasonable hypothesis of innocence. The State argues that it presented direct evidence against Walker in the form of his confession to the murder of Hamman to Brevard County agents, and therefore the special standard of review for circumstantial evidence cases does not apply.
*577 This is not a purely circumstantial evidence case. And, as we explain below, because we conclude that the State presented sufficient evidence, both direct and circumstantial, to support Walker's conviction for first-degree premeditated murder, we find that the trial court did not err in denying Walker's motion for judgment for acquittal.
"[C]ourts should not grant a motion for judgment of acquittal unless the evidence is such that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law." Woods v. State 733 So.2d 980, 985 (Fla.1999) (quoting Lynch v. State, 293 So.2d 44, 45 (Fla.1974)). "On appeal of a denial of a motion for judgment of acquittal where the State submitted direct evidence, the trial court's determination will be affirmed if the record contains competent and substantial evidence in support of the ruling." Conde v. State, 860 So.2d 930, 943 (Fla.2003) (citing LaMarca v. State, 785 So.2d 1209, 1215 (Fla.2001)). "In circumstantial evidence cases, `a judgment of acquittal is appropriate if the State fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt.'" Woods, 733 So.2d at 985 (quoting Barwick v. State, 660 So.2d 685, 694 (Fla.1995)). "Therefore, at the outset, `the trial judge must first determine there is competent evidence from which the jury could infer guilt to the exclusion of all other inferences.'" Id. (quoting Barwick, 660 So.2d at 694). "After the judge determines, as a matter of law, whether such competent evidence exists, the `question of whether the evidence is inconsistent with any other reasonable inference is a question of fact for the jury.'" Id. (quoting Long v. State, 689 So.2d 1055, 1058 (Fla.1997)). "So long as competent, substantial evidence supports the jury's verdict, it will not be overturned on appeal." Id. However, where the State presents direct evidence in the form of the defendant's confession, usually "this Court need not apply the special standard of review applicable to circumstantial evidence cases." Conde, 860 So.2d at 943 (citing Pagan v. State, 830 So.2d 792, 803-04 (Fla.2002)).
In his statement to law enforcement officers, Walker confessed to killing Hamman. This confession provides direct evidence that he unlawfully killed Hamman, the actus reus. However, in his statement, Walker also claims that he only meant to scare Hamman and humiliate him by driving him out to a remote location and forcing him to walk back naked. Further, Walker claims that he only killed Hamman after Hamman made threats to harm his family. Because Walker did not admit that he intended to kill Hamman, the State's case as to the intent element for first-degree premeditated murder, the mens rea, is based on circumstantial evidence. Thus, we apply the special standard of review only to the State's evidence establishing the element of premeditation.
As we recognized in Woods, "[p]remeditation may be established by circumstantial evidence." 733 So.2d at 985 (citing Holton v. State, 573 So.2d 284, 289 (Fla.1990); Wilson v. State, 493 So.2d 1019, 1021 (Fla.1986)). Premeditation is defined as
more than a mere intent to kill; it is a fully formed conscious purpose to kill. This purpose may be formed a moment before the act but must exist for a sufficient length of time to permit reflection as to the nature of the act to be committed and the probable result of that act.
Id. (quoting Wilson, 493 So.2d at 1021). "[E]vidence of premeditation includes `the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner *578 in which the homicide was committed, and the nature and manner of the wounds inflicted.'" Id. (quoting Spencer v. State, 645 So.2d 377, 381 (Fla.1994)).
In Woods, we found that although the victim's wife, Mrs. Langford, "did not witness Woods pull the trigger, the record discloses sufficient evidence from which the jury could infer premeditated design to the exclusion of all reasonable hypotheses of innocence." Id. Specifically, we found that
[t]he record indicates that prior to the murder Woods obtained a bill of sale, upon which he forged Mr. Langford's signature. Woods then insisted that both Langfords meet him at the library apparently under the pretense of signing and notarizing the bill of sale. From there, Woods directed them to a desolate area where he shot them multiple times with a weapon that he had procured in advance of the homicide. Indeed, several witnesses testified that they had seen Woods with a small-caliber firearm both on the day of and prior to the murder.
Id.
As in Woods, here, the State presented sufficient circumstantial evidence establishing premeditation by which the jury could exclude every other reasonable hypothesis except that Walker intended to kill Hamman and was, therefore, guilty of first-degree premeditated murder. There is evidence from which the jury could reasonably infer that Walker planned to kill Hamman. Walker admitted in his taped statement to police that he had planned to attack Hamman when he arrived at Joel Gibson's apartment. Loriann Gibson and Ritter overheard someone threatening Hamman during the beating, asking him if he was ready to die. When Hamman escaped from the apartment, Ford and Walker had a tarp and bag already prepared containing, among other things, the plastic flex ties consistent with those tied around Hamman's wrists and additional ammunition which could be used in the Llama .45. Walker already had the Llama .45 when he left Joel Gibson's apartment as well. On the way to the remote location, Walker stopped at Protz's house to obtain tape, gasoline, and rope. Although Protz only gave Walker tape, the jury could reasonably infer, as the trial court did, that Walker wanted the gasoline and rope because he planned to bind Hamman's body and, after killing Hamman, burn his body in order to make identification more difficult.
Further, the record shows that Walker had time to reflect and form the intent to kill Hamman. Walker had time to reflect during the drive from Joel Gibson's apartment to Protz's home, while wrapping tape around his fingers at Protz's home, and during the drive from Protz's home to the remote location outside the state park. Based on the nature of the weapon used to kill Hamman at the state park, the Llama .45, the jury could reasonably infer that Walker had time to reflect and form the intent to kill Hamman. The gun expert testified that the Llama .45 requires the user to methodically target and aim the gun between each shot. In his taped statement to police, Walker indicates that he shot Hamman multiple times using the Llama .45. Also, the jury could reasonably infer that Walker had the intent to kill Hamman based on the manner in which he was killed. Hamman was killed execution style. He was made to lie down on the ground with his arms bound behind his back. According to the medical examiner's testimony, Hamman was shot in the head and face six times, and at least several of those shots were fired at close range.
Accordingly, the State presented sufficient evidence to rebut Walker's reasonable *579 hypothesis of innocence as to the intent element of first-degree premeditated murder. Thus, we affirm Walker's conviction for first-degree premeditated murder and the trial court's denial of Walker's motion for acquittal.

4. Weight of Aggravating and Mitigating Circumstances
Next, Walker claims that the trial court erred in finding each of the aggravating factors and failed to properly weigh the aggravating and mitigating factors. The jury recommended death by a vote of seven to five for one count of first-degree premeditated murder. The trial court found three aggravating factors beyond a reasonable doubt: (1) the murder was committed during the course of a felony (kidnapping); (2) it was especially heinous, atrocious, or cruel (HAC); and (3) it was cold, calculated, and premeditated (CCP). The judge assigned the aggravators great weight. He did not consider any statutory mitigators because none were argued or presented. The trial court did consider ten nonstatutory mitigating circumstances, four of which he assigned some to moderate weight: (1) Walker's drug use/bipolar personality/sleep deprivationmoderate weight; (2) life sentence of codefendant Leigh Valorie Fordsome weight; (3) Walker's statement to policemoderate weight; and (8) Walker is remorseful slight weight. Based on the foregoing, the trial court sentenced Walker to death. As explained below, we deny Walker's claim.

(1) Aggravating Factors
In reviewing aggravating factors on appeal, as this Court stated in Alston v. State, 723 So.2d 148 (Fla.1998),
[I]t is not this Court's function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubtthat is the trial court's job. Rather, our task on appeal is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding.
Id. at 160 (quoting Willacy v. State, 696 So.2d 693, 695 (Fla.1997)). As explained below, the trial court's findings are supported by competent, substantial evidence with regard to each finding.

(a) Committed During the Course of a Kidnapping
First, the trial court found that "the capital felony was committed while the defendant was engaged in, or was an accomplice, in the commission of . . . any . . . kidnapping" pursuant to section 921.141(5)(d), Florida Statutes (2004). To establish this aggravator, the State must prove beyond a reasonable doubt each of the elements of kidnapping. Anderson v. State, 841 So.2d 390, 405 (Fla.2003). As the trial court noted in its sentencing order, the jury unanimously convicted Walker of kidnapping Hamman. Accordingly, the trial court applied the correct rule of law in finding that this aggravator was proved beyond a reasonable doubt.

(b) Especially Heinous, Atrocious, or Cruel
Second, the trial court found the murder was committed in a heinous, atrocious, or cruel manner (HAC). The trial court based this finding upon Evans v. State, 800 So.2d 182, 194 (Fla.2001), where this Court stated:
The HAC aggravator focuses on "the means and manner in which death is inflicted and the immediate circumstances surrounding the death." Brown v. State, 721 So.2d 274, 277 (Fla.1998). In Hall v. State, 614 So.2d 473 (Fla. 1993), we defined the HAC aggravator as follows:

*580 Heinous means extremely wicked or shockingly evil. Atrocious means outrageously wicked and vile. Cruel means that designed to inflict a high degree of pain with utter indifference to, or even enjoyment of the suffering of others. The kind of crime intended to be included as heinous, atrocious, or cruel is one accompanied by additional acts that show that the crime was conscienceless or pitiless and was unnecessarily torturous to the victim.

Id. at 478 (quoting trial court's instruction).
Evans, 800 So.2d at 194. This Court further stated that "a finding of HAC can be supported by the physical or mental torture suffered by the victim prior to death." Id.
In its sentencing order, the trial court applied the correct rule of law, turning the HAC definition in Evans into two questions:
Was the murder of Hamman a torturous one evincing extreme and a high degree of pain or utter indifference to or enjoyment of the suffering of others? Was the murder a conscienceless or pitiless crime and unnecessarily torturous to the victim?
The trial court then found that "[t]he evidence clearly establishes that the answer to the questions is `yes,'" and made, in applicable part, the following findings based on the record:
Walker could have initially shot the victim and killed him quickly. Instead, the victim was forced to endure fear, emotional strain, terror, torture and pain for several hours before death.
The evidence established that Hamman suffered from multiple blunt-force injuries and multiple gunshot wounds. Most blunt-force injuries were to the head, some on the back of his hands, forearms, legs, chest, back, hips, feet, knees and thighs. All the gunshot wounds were to the face. Some of the projectiles were still in the cranium at the time of autopsy.
Hamman was found to have a deep furrow in his neck, under his chin. It appeared he had been strangled because of the deep throat between the lines. The Medical Examiner testified that a ligature of some type was applied but released before Hamman died from strangulation. The Medical Examiner is of the opinion that the body manifests multiple signs of torture including the application of a ligature around the neck. Imagine the terror of being strangled and the ligature released for more torture before death.
The right upper arm had been fractured by the beating and the victim could not use it as a result. There were deep furrow marks on the wrists of the victim where he had been tied with the plastic cable tie. He had abrasions on his thigh and knees consistent with being dragged on a hard surface and like being tied and made to kneel on a paved road.
Hamman had numerous contusions on his arms and hands from trying to ward off blows or hits, classified as defensive wounds.
The gunshot wounds destroyed his lower jaw and damaged facial bones. Several teeth were broken out and found beside the body. While Hamman likely died instantly from the gunshot wounds, the manner in which they were inflicted are consistent with the utter brutality of this crime. None of the other wounds, abrasions and contusions would render a person unconscious according to the Medical Examiner. The person would be able to walk and be aware of what was happening to him. The wounds suffered, *581 however, would leave a bloody trail.
. . . .
The physical evidence established that Hamman died in fear, extreme anxiety and horror as a result of slow torture, humiliation and intense pain, all of which were unnecessary. The acts causing the emotions and physical pain stated above were inflicted upon a conscious victim in the dark hours of early morning in a confined environment. The ride in the dark trunk and the sensation of being strangled by a ligature of some kind before being shot although remaining conscious is enough to create horror in any human.
There can be no doubt that the murder was conscienceless, pitiless and unnecessarily torturous to the victim with a foreknowledge of death and indeed, heinous, atrocious and cruel.
The trial court's findings are supported by competent, substantial evidence. Having applied the proper rule of law, the trial court did not err in finding that this aggravator was proven beyond a reasonable doubt.
(c) Cold, Calculated, and Premeditated
Finally, the trial court found that the murder was cold, calculated, and premeditated (CCP). To establish the CCP aggravator, the State must prove beyond a reasonable doubt that
[1] the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold), . . . [2] that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated), . . . [3] that the defendant exhibited heightened premeditation (premeditated), and [4] that the defendant had no pretense of moral or legal justification.
Evans, 800 So.2d at 192 (quoting Jackson v. State, 648 So.2d 85, 89 (Fla.1994)). "[T]he facts supporting CCP must focus on the manner in which the crime was executed, e.g., advance procurement of weapon, lack of provocation, killing carried out as a matter of course." Lynch v. State, 841 So.2d 362, 372 (Fla.2003) (quoting Looney v. State, 803 So.2d 656, 678 (Fla.2001)).
In its sentencing order, the trial court found that the State had established the CCP aggravator beyond a reasonable doubt and properly applied each of the four elements above, citing to Lynch. In Lynch, this Court further defined each of the elements of the CCP aggravator as follows:
This Court has held that execution-style killing is by its very nature a "cold" crime. See Walls v. State, 641 So.2d 381, 388 (Fla.1994). In Looney, this Court noted the significance of the fact that the victims were bound and gagged for two hours, and thus could not offer any resistance or provocation. 803 So.2d at 678. Further, the defendants in that case had "ample opportunity to calmly reflect upon their actions, following which they mutually decided to shoot the victims execution-style in the backs of their heads." Id.

. . . .
As to the "calculated" element of CCP, this Court has held that where a defendant arms himself in advance, kills execution-style, and has time to coldly and calmly decide to kill, the element of "calculated" is supported. See Hertz v. State, 803 So.2d 629, 650 (Fla.2001); see also Knight v. State, 746 So.2d 423, 436 (Fla.1998). . . .
The third element, "heightened premeditation," is also supported by competent and substantial evidence. This Court has "previously found the heightened *582 premeditation required to sustain this aggravator where a defendant has the opportunity to leave the crime scene and not commit the murder but, instead, commits the murder." Alston v. State, 723 So.2d 148, 162 (Fla.1998); see also Jackson v. State, 704 So.2d 500, 505 (Fla.1997). . . .
The final element of CCP is a lack of legal or moral justification. "A pretense of legal or moral justification is `any colorable claim based at least partly on uncontroverted and believable factual evidence or testimony that, but for its incompleteness, would constitute an excuse, justification, or defense as to the homicide.'" Nelson v. State, 748 So.2d 237, 245 (Fla.1999) (quoting Walls, 641 So.2d at 388).
Id. at 372-73.
In its sentencing order, the trial court applied these standards and made, in applicable part, the following findings:
Hamman's visit to Joel Gibson's apartment . . . was planned. Walker and Ford were laying in wait for him and attacked him immediately. . . . At least one of those present told him they were going to kill him. . . . Walker was offended by Hamman because Hamman had hurt his feelings by intentionally making him think that the DEA was watching him. This tormented him mentally. At the remote area, after Ford had left in her car, Walker stated that Hamman told him Walker's parents' address and talked about raping his mother in front of a camera and sending the video to his father. Walker claimed this freaked him out. This part of his statement is not credible and is only an attempt to justify the murder after Defendant was caught. It is logical that a person severely beaten, with a broken arm, bloody and hurting, would not make defiant or threatening statements to the person who attacked him and was about to kill him. Additionally, the evidence establishes that . . . Walker ask[ed] Hamman in the apartment several times while beating him, "Are you ready to die?" . . . Accordingly, Walker expressed the intent to murder Hamman long before arriving at the murder scene.
The evidence establishes that Hamman did not offer any resistance to the beating or the shooting. The only thing the victim attempted to do was escape. . . . It is obvious by Defendant's statement and Hamman's pleas for his life that Defendant planned to kill him.
After Hamman had been recaptured after fleeing, he was placed in the dark trunk of a car in the dark early morning hours, to be transported to a remote spot to be killed. Walker even stopped on the way at the house of Joel Gibson's girlfriend trying to get rope and gasoline. . . . Walker and Ford left [Protz's] house and proceeded to the remote area. At that point, the victim was bound by securing his hands behind his back with a plastic cable tie and, by the testimony of the medical examiner, a garrot or garrot type device, was applied to the victim's throat with force likely to suffocate him but was released before it caused death. The victim's knees and thighs had abrasions consistent with being dragged and kneeling on concrete or asphalt. He was placed on his back, hands bound behind him, and was shot in the face six times with a big bore handgun, execution style.
Hamman's murder had been planned in advance and the beating and execution style shooting were cold and calculated. The victim was subjected to several hours of beating, threats, and torture before the cold execution style shooting. The premeditation was *583 heightened and deliberately ruthless. There was no pretense of legal or moral justification shown by the evidence. The reasons for the treatment of the victim that Walker gave in his statement do not provide any moral or legal justification.
The trial court's findings are supported by competent, substantial evidence, and the trial court applied the proper rule of law. See Lynch, 841 So.2d at 372-73. Accordingly, the trial court did not err in finding that the State had established the CCP aggravator beyond a reasonable doubt.

(2) Mitigating Factors
Walker claims that the trial court erred in rejecting all but four of the proposed mitigators and erred in failing to give enough weight to the four established mitigators. Based on these errors, Walker argues that the trial court did not correctly weigh the aggravating and mitigating factors. We disagree.
Walker presented the following mitigation evidence at the penalty phase, the Spencer hearing, and at sentencing. At the penalty phase, the defense presented the testimony of two mental health experts: Dr. Robert Radin, a psychiatrist who began treating Walker in March 2003, and Dr. Howard Bernstein, the clinical psychologist who testified at Walker's hearing on his motion to suppress. Both Dr. Radin and Dr. Bernstein diagnosed Walker as having bipolar disorder. Dr. Radin admitted that he "hardly observed" Walker's mood swings and did not really have evidence of bipolar disorder apart from Walker's self-reporting. Walker had never been previously diagnosed as bipolar. Although Walker reported that he had seen someone for therapy for eight to ten months when he was fifteen years old, Dr. Radin did not perceive Walker's condition as being longstanding.
Dr. Radin also testified that people facing serious charges often manifest anxiety or depression and that some people with Walker's bipolar condition might self-medicate with alcohol, marijuana, cocaine, or methamphetamines. He testified that consumption of these types of drugs alters one's thinking capacity. Dr. Bernstein also testified that people who are depressed tend to self-medicate with something that is fast acting, such as crack cocaine, methamphetamines, or "speed." He further testified that speed is not a narcotic but a central nervous system stimulant, and if a bipolar person used speed for a few days, the person's mental activity would likely become more hyperactive. He further testified that ingestion of drugs would aggravate the bipolar disorder.
At the Spencer hearing, the victim's sister, Michelle Hamman, gave a statement. The trial court also received letters from Walker's sister, Bernita Lou Walker, and Walker's friend, Pamela Townsend, which requested that the court show mercy on Walker. At the sentencing hearing, Walker's friend, Jean Rebert, testified on Walker's behalf. She had a counseling background and knew of his drug problems. She testified that she had a "grandmotherly" relationship with Walker and that he would talk to her about his problems, and he would do kind things for her like scrub her carpets or help take care of her animals. She testified that he was not a scary man but was always "very outgoing and well-spoken." She felt that his addiction to drugs caused him to be violent and that he does not deserve the death penalty.
Based on this evidence, Walker proposed nine nonstatutory mitigators: (1) on the day of the murder, Walker suffered from bipolar disorder and was under the influence of drugs and sleep deprivation; (2) Walker's codefendant, Ford, will not *584 get the death penalty; (3) Walker gave his statement to the police; (4) Walker did not resist arrest; (5) Walker tried to protect his codefendant girlfriend; (6) Walker is unselfish in character as he did not attempt to gain any benefit by providing information; (7) Walker did not harm the Good Samaritan in Live Oak; (8) Walker was remorseful; and (9) the court should have mercy and sentence Walker to life in prison. The trial court also considered a tenth nonstatutory mitigator, that the victim was a bad person. In its sentencing order, the trial court thoroughly considered each mitigator, finding that only mitigators (1), (2), (3), and (8) were established and giving each mitigator slight to moderate weight.
In reviewing the weight given to mitigating factors, this Court has stated that "[t]he relative weight given each mitigating factor is within the discretion of the sentencing court." Trease v. State, 768 So.2d 1050, 1055 (Fla.2000) (citing Campbell v. State, 571 So.2d 415, 420 (Fla.1990)). "We therefore recognize that while a proffered mitigating factor may be technically relevant and must be considered by the sentencer because it is generally recognized as a mitigating circumstance, the sentencer may determine in the particular case at hand that it is entitled to no weight for additional reasons or circumstances unique to that case." Id. "When addressing mitigating circumstances, the sentencing court must expressly evaluate in its written order each mitigating circumstance proposed by the defendant to determine whether it is supported by the evidence and whether, in the case of nonstatutory factors, it is truly of a mitigating nature." Campbell, 571 So.2d at 419 (footnote omitted), receded from on other grounds by Trease, 768 So.2d at 1055. "A mitigating circumstance need not be proved beyond a reasonable doubt by the defendant. If you are reasonably convinced that a mitigating circumstance exists, you may consider it as established." Id. at 419-20 (quoting Fla. Std. Jury Instr. (Crim.) Homicide). "The court next must weigh the aggravating circumstances against the mitigating and, in order to facilitate appellate review, must expressly consider in its written order each established mitigating circumstance." Id. at 420. "To be sustained, the trial court's final decision in the weighing process must be supported by `sufficient competent evidence in the record.'" Id. (quoting Brown v. Wainwright, 392 So.2d 1327, 1331 (Fla.1981)).
In its sentencing order, the trial court expressly considered each of the nine nonstatutory mitigating circumstances proposed by Walker as well as an additional tenth nonstatutory mitigator, that the victim was a bad person. The trial court did not consider statutory mitigation because none was requested by Walker. Further, the trial court provided detailed factual findings as to reasons or unique circumstances upon which it decided to afford or not afford weight to a particular mitigator based on the evidence presented at trial, the penalty phase, and the Spencer hearing. We find that the trial court thoroughly considered each mitigator and the unique circumstances of this case. Therefore, we find that the trial court did not abuse its discretion in assigning weight to each mitigator.
Further, based on the foregoing discussion of the trial court's findings as to aggravating and mitigating factors, we find that his final decision in weighing these factors is supported by competent, substantial evidence in the record. The three weighty aggravators, which were established beyond a reasonable doubt, far exceed the four nonstatutory mitigators. Accordingly, Walker is not entitled to relief on this claim.

*585 5. Proportionality
Finally, we affirm Walker's death sentence because we find that it is proportional. "This Court must review the proportionality of a death sentence, even if the issue has not been raised by the defendant." Bolin v. State, 869 So.2d 1196, 1204 (Fla.2004) (citing Jennings v. State, 718 So.2d 144, 154 (Fla.1998)). Proportionality review "is not a comparison between the number of aggravating and mitigating circumstances." Crook v. State, 908 So.2d 350, 356 (Fla.2005) (quoting Urbin v. State, 714 So.2d 411, 416 (Fla.1998)). Instead, the Court considers the totality of the circumstances to determine if death is warranted in comparison to other cases where the death sentence has been upheld. Davis v. State, 859 So.2d 465, 480 (Fla. 2003). In addition, the heinous, atrocious, or cruel aggravator is one of the "most serious aggravators set out in the statutory sentencing scheme." Larkins v. State, 739 So.2d 90, 95 (Fla.1999).
As stated earlier, the trial court sentenced Walker to death based upon the following. The jury recommended death by a vote of seven to five for one count of first-degree premeditated murder. The trial court found the three weighty aggravating factors set out above: (1) committed during the course of a felony (kidnapping); (2) HAC; and (3) CCP. Further, the trial court found four nonstatutory mitigators of which he assigned some to moderate weight: (1) Walker's drug use/bipolar personality/sleep deprivationmoderate weight; (2) life sentence of codefendant Leigh Valorie Fordsome weight; (3) Walker's statement to policemoderate weight; and (8) Walker's remorseslight weight. Based on the foregoing, the trial court sentenced Walker to death.
Under the totality of the circumstances, Walker's sentence is proportional in relation to other death sentences that this Court has upheld. See, e.g., Davis, 859 So.2d at 479-80 (finding death sentence recommended by a vote of seven to five by jury proportional where three aggravators, including crime committed while on felony probation, HAC, and CCP, outweighed one statutory mitigator given slight weight and four nonstatutory mitigators given some weight); Connor v. State, 803 So.2d 598, 612-13 (Fla.2001) (finding death sentence proportionate where court found three aggravating factors, including HAC and CCP, outweighed four nonstatutory mitigators); Mansfield v. State, 758 So.2d 636, 647 (Fla.2000) (upholding death sentence where two aggravators, HAC and crime committed during the commission of a sexual battery, outweighed five nonstatutory mitigators); Hauser v. State, 701 So.2d 329, 332 (Fla. 1997) (finding death sentence proportionate where victim was strangled and trial court found three aggravators of HAC, CCP, and pecuniary gain outweighed one statutory mitigator and four nonstatutory mitigators).
Accordingly, we affirm Walker's death sentence.

CONCLUSION
For the reasons expressed above, we affirm Walker's convictions and sentence of death.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] Loriann Gibson is not related to Joel Gibson.
[2] According to Walker's statement to police, he was involved with Hamman in the manufacture and sale of methamphetamine, also referred to as "meth" or "crank." Hamman supposedly possessed the "formula" for making meth and would give lessons for $2500, then receive twenty-five percent of his students' profits.

Walker indicated that Joel Gibson was also involved in drug-related activities. Walker and Ford knew Joel because they worked for him in his lawncare business.
[3] Walker's statement indicates that Hamman made him afraid that the DEA was watching him after an incident the previous day where Walker helped Hamman beat up one of Hamman's "students," Patrick Connelley. Connelley was also the roommate of Loriann Gibson and Ritter. Walker said that because Hamman scared Connelley, Connelley went to the police. After that, Hamman was afraid that the DEA would get involved and made Walker suspect that the DEA was watching him. Walker indicated that he wanted to get back at Hamman for scaring him.

In addition, Walker indicated that the women may have overhead the attack on Connelley, and Hamman began talking about killing them. Walker felt that Hamman was feeling too self-important and wanted to teach him a lesson.
[4] At some point prior to Hamman's escape, Dennis Goss, Joel's neighbor on the second floor, was disturbed by his dog barking and the sounds of someone being beaten "real hard." Joel knocked on Goss's door to apologize for the noise and explained to Goss that "somebody got too big for their britches." Goss did not call the police because he knew that Joel carried a .45 Magnum, and Walker carried a Colt .45.
[5] Goss later saw people down by the mailboxes and heard someone say, "Get in the car, quick." Goss recalled that it was a man's voice but not Joel's.
[6] According to Walker's statement, Ford left before Walker shot Hamman.
[7] At some point during the ride, Loriann became upset when she saw a driver in another vehicle that reminded her of Hamman. She recalled that Walker told her that he had taken care of Hamman and that she would not be seeing him again.
[8] The officers searched Walker and found two loaded magazines for a .45 caliber pistol, a pocket knife, one live round, one spent casing, and a blackjack.
[9] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[10] Walker claimed that Ford left at this point.
[11] The DNA expert testified that the blood stains recovered from the lining of Ford's truck matched Hamman's blood type. Also, the blood on the barrel of the Llama .45 matched Hamman's, and Hamman could not be excluded as a donor of blood on the trigger.
[12] While Dr. Quaiser testified that the cause of death was a combination of blunt force injuries and gunshot wounds to the head, he believed the gunshot wounds most likely caused Hamman's death since the loss of blood from the blunt force injuries would be mild to moderate, meaning that it would take a long time for a person to die from blunt-force injuries alone.
[13] Dr. Quaiser removed the flex ties from Hamman's wrists during the autopsy. The firearms expert testified that these flex ties were consistent with the ones recovered from the backpack and Rubbermaid container found in Hamman's truck.
[14] The firearms expert further found that all six of the Remington Peters brand cartridge casings found on the roadway near the victim were fired from the Llama .45, and the live ammunition found in the Llama was also Remington Peters brand casings. He also testified that the serial number on the Llama .45 matched the serial number on the gun box found in Joel Gibson's apartment.
[15] Spencer v. State, 615 So.2d 688 (Fla.1993).
[16] The aggravators are: (1) the murder was committed during the course of a felony (kidnapping)great weight; (2) the murder was especially heinous, atrocious, or cruel (HAC)great weight; and (3) the murder was cold, calculated, and premeditated (CCP) great weight.
[17] The nonstatutory mitigators are: (1) Walker's drug use/bipolar personality/sleep deprivationmoderate weight; (2) life sentence of codefendant Leigh Valorie Fordsome weight; (3) Walker's statement to police moderate weight; and (4) Walker's remorse slight weight. The trial court rejected six other nonstatutory mitigators requested by Walker. See discussion of Issue 4 infra pp. 580-85.
[18] Exhibits 50 through 54 depict blood stains on the stairs of Joel Gibson's apartment and blood stains outside the apartment. Exhibits 75 and 80 through 89 depict the blunt force trauma injuries to Hamman's body.
[19] We note that Walker bases both of these claims on this Court's recent decision in State v. Steele, 921 So.2d 538 (Fla.2005). However, as Walker properly concedes, Steele is inapposite to claim (7). Further, Walker's reliance on Steele for claim (6) is misplaced and, therefore, this claim is without merit.
[20] Because Walker does not dispute the trial court's denial upon this ground, we do not address it further.
[21] The State called Officer Boren, who testified that while he was running radar on Interstate 10 sometime between 9 and 10 a.m., Ritter and Loriann drove up to his car. They were yelling, "He's trying to kill us" and said they had been kidnapped but had escaped. Officer Boren determined that Walker was at the Penn Oil gas station and called for backup. Lieutenant Creech of the Suwannee County Sheriff's Office testified that he responded to Officer Boren's location on Interstate 10. Creech obtained a description of Walker from Ritter and Loriann and put out a BOLO. In the meantime, the Suwannee County Sheriff's Department contacted Brevard County law enforcement regarding a possible murder suspect and witnesses.
[22] Lieutenant Williams testified that he asked Walker if he hurt anyone, but that Walker replied that the question was rhetorical and gave no further response. Walker did tell Lieutenant Williams that his first name was Christopher. Lieutenant Williams removed Walker's wallet and found two driver's licenses, one of which was a Virginia driver's license bearing the name Christopher Dwayne Walker.
[23] Walker signed the Miranda waiver-of-rights form under the name Christopher. During the interview with Brevard County agents, however, he admitted that his real name is Robert Shannon Walker, II.
[24] The interview was recorded by Agent Hererra with a digital recorder which was out on the table in view.
[25] Agent Heyn also tried to covertly record the entirety of the interview with the recorder in his lap underneath the table, including the periods in which Walker needed a break and asked to stop recording. However, his recorder did not pick up the conversation.
[26] Dr. Bernstein reviewed the records of Dr. Robert Radin, a psychiatrist with Circles of Care who began treating Walker in the Brevard County jail in March 2003. Dr. Radin first diagnosed Walker with bipolar disorder as Walker had never previously been diagnosed with this condition. Dr. Radin's testimony was not presented until the penalty phase of Walker's trial. See discussion of Issue 4 infra pp. 580-85. Dr. Bernstein testified that Walker's "severe and chronic mental condition seems to be controlled and stabilized by the psychiatric medicine" and that Walker had the "capacity to proceed."
[27] Walker also argues that the trial court improperly discounted the testimony of Dr. Bernstein. However, this Court defers to the trial court's "superior position `to evaluate and weigh the testimony and evidence based upon its observation of the bearing, demeanor, and credibility of the witnesses.'" Taylor, 937 So.2d at 599 (quoting Stephens v. State, 748 So.2d 1028, 1034 (Fla.1999)).
[28] We do not reach Walker's related equal protection argument based on Ring because the "course of a felony" aggravator rests on a unanimous jury verdict finding him guilty of kidnapping in addition to premeditated murder. This placed him in a class of persons subject to capital sentencing under the Sixth and Eighth Amendments.