992 So.2d 96 (2008)
Russell HUDSON, Appellant,
v.
STATE of Florida, Appellee.
No. SC06-748.
Supreme Court of Florida.
July 3, 2008.
As Revised on Denial of Rehearing September 25, 2008.
*100 Carey Houghwout, Public Defender, and Gary Lee Caldwell, Assistant Public Defender, Fifteenth Judicial Circuit, West Palm Beach, FL, for Appellant.
*101 Bill McCollum, Attorney General, Tallahassee, Florida, and Sandra S. Jaggard, Assistant Attorney General, Miami, FL, for Appellee.
PER CURIAM.
Russell Hudson appeals from a judgment of conviction and sentence of death for the first-degree murder of Lance Peller. He also appeals his conviction for armed kidnapping of Jennifer Fizzuoglio and the consecutive life sentence he received for that conviction. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons explained below, we affirm the convictions and sentences.

FACTS AND PROCEDURAL HISTORY

The Guilt Phase
In October of 2001, Lance Peller, who was twenty-two years old, was a drug dealer in Deerfield Beach, Florida, selling cocaine and ecstasy out of his apartment in the Tivoli Lakes Club Apartments. Russell Hudson, who was thirty-two years old at the time, was a friend of Lance Peller and was also involved in selling drugs by virtue of working for another drug dealer named Felipe Mejia. Peller and Hudson were members of a group of friends and acquaintances that partied together regularly and consumed large quantities of cocaine and ecstasy.
Hudson, by his own characterization, was being "groomed" to be the number two man to Mejia. As part of this grooming and newly accorded responsibility, Hudson was instructed by Mejia approximately three weeks before the murder that Peller was underselling Mejia and needed to be killed.[1] Mejia offered to supply Hudson with a gun. Although Hudson denied taking the gun from Mejia, Hudson's roommate, Jeffrey Stromoski, saw Hudson with a handgun similar to the murder weapon about a month before the murder.
Hudson went to Peller's apartment on the evening of Saturday, October 20, 2001, with Peller's own handgun that had been stolen in a burglary of Peller's apartment in August of 2001. Jennifer Fizzuoglio, a dancer, was Peller's girlfriend in October of 2001. She had not seen Peller all day Saturday and decided to drop by his apartment on the way to work. After talking with him by phone earlier that evening, she drove her red Ford Mustang to his apartment, arriving somewhere between 8 p.m. and 8:30 p.m. During her call to Peller, he did not say anything about a problem with Hudson and did not sound upset or nervous. When she arrived, Peller smiled, hugged her, and let her into the apartment.
When Fizzuoglio arrived, Hudson was already there, sitting in a chair in front of the coffee table. She knew Hudson only slightly after having met him at a party some weeks earlier. Fizzuoglio sat down on the floor next to the coffee table. Sometime after Fizzuoglio arrived, Peller's phone rang and while he talked on the phone, she and Hudson made small talk. When Peller got off the phone, Hudson rose and started moving toward the bathroom, which was visible from the living room in the small apartment. Suddenly, Hudson turned around, crouched down in *102 front of the coffee table, and pulled out a gun.
Peller looked shocked and said something to the effect of, "how did you get my gun?" Hudson kept saying, "Tell me what I want to hear, Lance." Fizzuoglio began crying and "freaking out" and offered Hudson money, which she assumed was at the root of the problem between them. Hudson then made a cell phone call to someone and said, "Do I have to do this now? Somebody showed up." It appeared to Fizzuoglio that Hudson did not want to commit the murder and was attempting to find a way to get out of it. Hudson kept the gun in his hand during this call.
Hudson then decided to use some cocaine and tried to prepare it himself but could not do so while holding the gun. He made Fizzuoglio prepare the lines of cocaine and ordered Fizzuoglio and Peller to use some cocaine after him. Hudson then started "freaking out," saying there were people outside who would kill them all if he did not kill Peller. He kept looking out the window and the door peephole, but Fizzuoglio said she never saw anyone outside. He told Peller and Fizzuoglio to hide and Peller went into the bathroom and sat on the floor. Fizzuoglio crouched in the kitchen, where her fingerprint was later found on the floor.
Peller became very anxious and began hyperventilating. Fizzuoglio tried to calm him down, but they were both scared, especially when Hudson kept saying someone was outside. Peller asked Hudson to let Fizzuoglio go because she was not involved in the dispute. Finally, Peller asked Hudson for a phone to call his father to tell him goodbye and Hudson kicked a phone over to him. Peller called his father at 9:13 p.m. and, after no one answered, left a message.[2]
While Peller was on the telephone and Fizzuoglio was crouching in the kitchen, Hudson came over to her and said, "Are you going to be alright with this?" Hudson then went and banged his hand and his head on the door in what appeared to Fizzuoglio to be an effort to psyche himself up. She testified that, "with one movement, one second, he stops and he walks over and grabs a blanket and then he walks backto where Lance was ... inside the bathroom" and "[h]e shot him." Hudson shot Peller once through the blanket into the top of Peller's head, killing him almost instantaneously.
Immediately after shooting Peller, Hudson put on latex gloves and searched the apartment, handing things to Fizzuoglio to carry, including Peller's wallet, keys, a scale, and several cell phones. He then forced her out the door and into the passenger side of her red Mustang after saying he could not find his keys to the black Nissan, which he had driven to the complex and left parked in the lot. Hudson put the gun under his left leg and drove while Fizzuoglio was in the passenger seat. She testified that he made a phone call during the ride as they proceeded west on 10th street. After he finished the call, he looked at her and said, "I'm sorry. I have to do this." At that moment, she jumped out of the car as it was moving and ran across the street into a ditch. She then banged on a car asking for help but the people in the car were afraid and drove off, calling 911. She stated that she also jumped on the back of a tow truck but jumped off when Hudson drove up. She saw a marked patrol car at a stop light and *103 ran over, jumping onto the hood of the car. The car was driven by Deputy Kim Bauer, who was on her way to work when she was flagged down by Fizzuoglio.
Fizzuoglio was hysterical, crying, and screaming that she had just seen her friend killed and that someone was trying to kill her, but she did not identify who was involved or where it occurred. The female officer called for backup deputies, who arrived and heard the same story. Fizzuoglio also told them that she had ingested some cocaine and the deputies, because they thought she was overdosing on drugs, sent her to the hospital alone in an ambulance. Only later, upon receiving an anonymous call about the murder, did Broward deputies realize she was telling the truth and went to interview her at the hospital.
Sometime after Hudson had left the scene with Fizzuoglio, two teenage boys who had previously bought drugs from Peller went to his apartment to see about buying some cocaine. They had called around 9 p.m. or a bit earlier and were told by Peller that he was busy and to call back in about thirty minutes. Peller did not sound upset and did not tell them anything about Hudson or the gun. They called back a few more times beginning about 9:15 p.m. but no one answered, so they proceeded to the apartment and arrived around 9:30 p.m.
One of the boys stayed in the car while the other went in to see if Peller was home. He was able to enter the apartment because the door was ajar. He came back out and told his friend that he thought Peller was passed out in the bathroom. Both boys went back in and found Peller lying in the bathroom against the wall with blood on the floor and a beer bottle in his hand. The boys did not call the police but instead went through the apartment looking for drugs. The boys left and went their separate ways. One of the boys decided to report the murder and made an anonymous call to the police. The other boy returned alone to the apartment to look around and was there when the police arrived.
Robert Moreau was a friend of both Hudson and Peller. Moreau's apartment was within walking distance from Peller's apartment in the large complex. Around 11 p.m., Hudson called Moreau's apartment from a pay phone and asked to be picked up at a Dairy Queen located in Pompano Beach, which was a few miles away from his apartment. Moreau picked him up near the Dairy Queen at 11:15 p.m. Hudson appeared normal, which for a Saturday night meant "out of it." Moreau did not take Hudson to pick up his car, but took him to Moreau's apartment where Hudson changed clothes.
Also that same evening, around 11 p.m., Denver Wilson was walking through the parking lot of the First Presbyterian Church of Pompano Beach on the way to his house, which was located near the church. The First Presbyterian Church is located about 400 feet from the Dairy Queen where Hudson made his telephone call to Moreau. While walking toward his house, Wilson saw a red Mustang with the motor still running, backed into a parking space in the parking lot adjacent to the church. The car remained there all day Sunday. On October 22, a deputy was dispatched to the church to check out the red Mustang and found it parked there, with the keys in the ignition, still in the "on" position, and with a dead battery. The Mustang was identified as being owned by Fizzuoglio and Hudson's DNA was found on the steering wheel.
Fizzuoglio met with deputies several more times after leaving the hospital in the early morning hours of October 21. She finally told detectives that the person who *104 murdered Peller was named "Russell." She was later shown a photo lineup of twelve different individuals with the name "Russell" and picked Hudson's photo from that group. She also identified Hudson in court as the person who shot Peller. In addition, John Coyne, an acquaintance of Hudson, also testified that Hudson essentially confessed to him in a phone conversation they had while Hudson was in jail.
It was not until July 20, 2002, that the murder weapon was found. A gardener found the handgun pushed down into the dirt of a flower bed next to the same First Presbyterian Church building where the Mustang had been found. The serial number matched a gun stolen from Peller's apartment in a burglary that occurred about two months before his murder. No fingerprints were found on the gun.
Hudson was arrested at 11:40 p.m. on October 21, after he arrived to pick up his black Nissan that was still in the parking lot in front of Peller's apartment. Hudson's wallet contained Peller's driver's license and credit cards, as well as Fizzuoglio's driver's license. Hudson had used one of Peller's credit cards to buy snacks at an Exxon gas station on the morning after the murder. A bullet consistent with those used in the murder weapon was found in the pocket of the driver's side door in Hudson's Nissan.
After being taken into custody and receiving Miranda[3] warnings, Hudson gave two statements to deputies that were similar to his trial testimony. His version of events was that about three weeks before the murder, he was told by Mejia that Peller had to be killed for underselling Mejia. Hudson said he refused to commit the murder and refused Mejia's offer of a gun. Hudson said he went to Peller's apartment around 4:30 p.m. on October 20 to warn Peller of the serious threat to him by Mejia and found Fizzuoglio there arguing with Peller. Hudson said Peller asked him to deliver a package of marijuana to a buyer near the Dairy Queen in Pompano Beach. Hudson said he asked Fizzuoglio to take him, in order to allow her time to cool off from the argument, although he drove her red Mustang because he said she was too upset to drive.
Hudson said Fizzuoglio dropped him off and went to run an errand, but never returned. He said the buyer did not show up until around 9 p.m., after which they rode around in the buyer's car checking the quality of the marijuana. Hudson said that he was dropped off back near the Dairy Queen. He explained having Peller's credit cards and the two driver's licenses by testifying that he had been at a club with Peller and Fizzuoglio several days before the murder and drinks had been spilled on the table where Peller's wallet and Fizzuoglio's driver's license were lying. In the confusion, Hudson said, he picked up those items, put them in his pocket, and later forgot to return them. He said he paid for the snacks at Exxon with Peller's card accidentally.
At the conclusion of the guilt phase, the jury found Hudson guilty of the first-degree murder of Peller and armed kidnapping of Fizzuoglio.

The Penalty Phase
During the penalty phase, the State presented the testimony of Jennifer Fizzuoglio, Detective Glen Bukata, and Detective John Butchko. Fizzuoglio testified again to the events on the night of the murder, especially how scared she and Peller were and about the call he made to his father. Based on a stipulation that Peller's father would not be required to testify to the voice mail he received from his son, Detective *105 Bukata related the contents of the voice mail message Peller left on his father's telephone at 9:13 p.m. Peller said, "Hi, Dad, it's your son. I love you. I just want to tell you and Mom that I love you both much. I'm about to die. I love you both. Bye."
Detective Butchko testified to the details of Hudson's prior second-degree murder conviction, which occurred when Hudson was a juvenile. In that case, the victim was a fifty-five year old man named Rosenbrock who gave Hudson money and drugs for sex. Hudson stabbed the man thirty-four times because, according to Hudson's report to police, the man was trying to get him to have sex with another man for money.
In mitigation, Hudson presented the testimony of Dr. David Kramer, a clinical psychiatrist. He had not examined Hudson, but testified in response to hypothetical questions about the effect that parental abandonment and sexual abuse during adolescence would have on a person. In his opinion, that sort of abuse can cause a person to feel danger, stress, powerlessness, and aggression, although murder is not a predicted result from childhood sexual abuse.
Rusty Rabakozy, a close childhood friend, testified that when he was a young teenager, his own guardian sexually abused him and made him go out with other men. Rabakozy said the guardian also "pimped out" Hudson regularly for several years, paying him with drugs. Hudson's father, James Hudson, testified that Hudson's mother abandoned him when he was two years old. Hudson was a very smart and good child but got into trouble with drugs in his teens. Hudson was hospitalized at South Florida Hospital several times, although the details of his hospitalization were not revealed. Hudson earned his GED while in prison and, when he got out of prison for the Rosenbrock murder, Hudson began a career in computers. James said Hudson was very close to his sister and is a "charmer" whom people will believe. He testified that Hudson's half-sister, Theresa, idolized Hudson. Hudson has also been a source of support and encouragement for his sister, Tracie Ann, who testified that they have maintained a close relationship.
After his parents' divorce when Hudson was two years old, he lost contact with his siblings during his childhood. His mother testified that she saw him only a handful of times after the divorce, the last time being when he was about ten years old, even though she lived across the street from him. After his father remarried, Hudson's relationship with his father suffered and, Hudson reported to a friend, his stepmother had him committed to a mental hospital "to get rid of him."
Hudson's wife, Rosemary, testified that drugs caused them to drift apart, although she still loved him. Hudson wrote his stepson a very inspiring letter from prison advising him to work hard and stay out of trouble. Several other acquaintances of Hudson testified that he used a lot of drugs.
Hudson was close friends with Kim Hurtado, who asked him to become guardian to her teenaged son, Sean, for a couple of months right before the murder. Hudson was a great guardian to Sean, making him do his homework, ensuring that he had lunch money, teaching him about computers, and assisting him in many ways. Hurtado and Sean testified they still love Hudson and think he is a wonderful person.
The jury recommended death by a vote of seven to five. After finding that the *106 aggravators outweighed the mitigators, the trial court sentenced Hudson to death.[4]

ANALYSIS
Hudson raises eleven issues on appeal.[5] We will discuss each of Hudson's claims in turn. In addition to the issues raised by Hudson, in every case in which a sentence of death is imposed this Court must review the sufficiency of the evidence and whether the death sentence imposed is proportionate.

I. Hearsay Testimony of Victim's Telephone Call
Hudson first argues that the trial court erred in allowing Peller's friend, Robert Pritchard, to testify about the telephone call he received from Peller on the night of the murder. Pritchard, a married man with children, testified that he had known Peller for about four years and had worked with him at a Midas shop until sometime in August 2001. Pritchard was an assistant manager there and Peller had helped him manage the office. Although they no longer worked together, they had remained in contact by telephone and Peller would visit him at the Midas shop a few times a month.
Pritchard testified that he last spoke to Peller by telephone on the night Peller was shot at about 7 p.m. or 7:30 p.m., when Peller called Pritchard on his cell phone at home. Pritchard could see by caller ID that it was Peller and, because he had known Peller for four years, recognized his voice. Although Peller sounded calm, he told Pritchard that he needed a gun because someone was there to kill him. Peller "was trying to tell [him] who was in the room without saying any names" and would only say that it was the same person Peller had called Pritchard about some weeks earlier, asking how to bond someone out of jail.[6] Peller also explained to *107 Pritchard that the problem arose because he was underselling a drug dealer. In the background, Pritchard could hear something that sounded like a bathroom vent fan running during their conversation. When Peller said the man was there to kill him, Pritchard told him to call the police but Peller responded, "he's not going to because it's a friend" and that "everything would be okay." Pritchard did not call the police.
We review a trial court's decision to admit evidence under an abuse of discretion standard. Williams v. State, 967 So.2d 735, 747-48 (Fla.2007), cert. denied, ___ U.S. ___, 128 S.Ct. 1709, 170 L.Ed.2d 519 (2008); Johnston v. State, 863 So.2d 271, 278 (Fla.2003). That discretion, however, is limited by the rules of evidence. Johnston, 863 So.2d at 278. The State contends on appeal, as it did below, that Peller's statements made during the telephone call to Pritchard qualified as either spontaneous statements or excited utterances under section 90.803, Florida Statutes (2004). The trial court admitted the testimony without indicating on which evidentiary basis.
Section 90.803(1) and (2), Florida Statutes (2004), sets forth the two pertinent exceptions to the rule prohibiting hearsay evidence:
(1) SPONTANEOUS STATEMENT.A spontaneous statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter, except when such statement is made under circumstances that indicate its lack of trustworthiness.
(2) EXCITED UTTERANCE.A statement or excited utterance relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.
The excited utterance exception contained in section 90.803(2) requires that the "statement or excited utterance" relate to "a startling event or condition" and be made while the declarant was under the stress of excitement caused by the event or condition. We have explained that to qualify as an excited utterance, the statement must be made: (1) "regarding an event startling enough to cause nervous excitement"; (2) "before there was time to contrive or misrepresent"; and (3) "while the person was under the stress or excitement caused by the event." Henyard v. State, 689 So.2d 239, 251 (Fla.1996). This Court has observed that "[i]f the statement occurs while the exciting event is still in progress, courts have little difficulty finding that the excitement prompted the statement." State v. Jano, 524 So.2d 660, 662 (Fla. 1988) (quoting Edward W. Cleary, McCormick on Evidence § 297 at 856 (3d ed.1984)). "While an excited utterance need not be contemporaneous to the event, it must be made while the declarant is under the stress of the startling event and without time for reflection." Hutchinson v. State, 882 So.2d 943, 951 (Fla.2004); see also Rogers v. State, 660 So.2d 237, 240 (Fla.1995).
Time for reflective thought is significant because it also provides time to contrive or misrepresent. See Evans v. State, 838 So.2d 1090, 1093 (Fla.2002) (citing Stoll v. State, 762 So.2d 870, 873 (Fla. 2000)). This is well illustrated in Hutchinson, in which we found that statements made by the victim in a telephone conversation to a friend some undetermined period of time after she had a heated argument with the defendant did not qualify as an excited utterance. 882 So.2d at 951-52. We explained, "[W]e can only speculate as to whether [the victim] engaged in reflective thought. However, this was a long *108 enough time interval to permit reflective thought." Id. at 951.
Similarly, in Mariano v. State, 933 So.2d 111 (Fla. 4th DCA 2006), the declarant, sounding hysterical, called the witness some thirty to ninety minutes after the declarant and the defendant argued in a car, and related the evening's events including the defendant's attempt to stab the declarant and his threat to run her down. Id. at 116-17. The court refused to admit the statement as an excited utterance because the "statement took the form of a narrative of the events, which in and of itself indicates that the victim is reflecting upon the events of the evening." Id. at 117. The "[f]actors that the trial judge can consider in determining whether the necessary state of stress or excitement is present are the age of the declarant, the physical and mental condition of the declarant, the characteristics of the event and the subject matter of the statements." Williams, 967 So.2d at 748 (alteration in original) (quoting Jano, 524 So.2d at 661).
The circumstances in this case are distinguishable from those seen in Hutchinson and Mariano, and more comparable to those found in Viglione v. State, 861 So.2d 511 (Fla. 5th DCA 2003). In Viglione, the Fifth District held that telephone calls the victim made to several witnesses while he was kidnapped and was forced to try to get money to pay for his release were admissible as either a spontaneous statement or an excited utterance. Id. at 513. A review of the circumstances surrounding Peller's call to Pritchard in this case demonstrates that Peller's statements meet the requirements for the excited utterance exception. The fact that he called Pritchard and said he needed a gun was a direct reaction to the presence of a gunman who announced he was there to murder Peller. The presence of Hudson with a gun and an announced intent to kill Peller, as described by Peller in his telephone call to Pritchard, was a sufficiently startling condition or event to meet the requirements of section 90.803(2). The statements were made while the event was ongoing, rather than being related after the event, negating the likelihood that Peller had time to contrive or misrepresent; and the statements were made while Peller was under the continuing stress or excitement caused by the event. See Henyard, 689 So.2d at 251.
The fact that Peller expressed the belief that he probably would not be killed by a friend does not lessen the obvious anxiety that death was a possibility because he was "underselling another drug dealer." Nor is the fact that Peller's voice did not sound excited determinative of whether his statements meet the requirements of section 90.803(2) as an excited utterance. Section 90.803(2) allows admission of either "a statement or excited utterance" so long as the statement is made "relating to a startling event or condition" and is made while the declarant is "under the stress of excitement caused by the event." § 90.803(2), Fla. Stat. (2004) (emphases supplied). As the court noted in Tucker v. State, 884 So.2d 168 (Fla. 2d DCA 2004), "`excitement' for purposes of an utterance is not a matter that is determined exclusively by tone of voice. Some people remain calm of voice when under stress; others can be excited of voice when fully capable of misrepresentation." Id. at 175.
Pritchard testified that Peller did not name the person who was present, but went to some lengths to give identifying information by telling Pritchard it was the man Peller had contacted Pritchard about several weeks earlier, asking about how to bond someone out of jail. Pritchard also heard a bathroom fan running, which indicated that Peller might have been attempting *109 to avoid being overheard. These facts indicate the possibility that Peller did not sound excited because he was consciously attempting not to be overheard in his telephone call. We conclude that Peller's statements to Pritchard meet the requirements of section 90.803(2) for statements relating to a startling event or condition while under the stress or excitement of the event or condition.[7]
Because the statements related in Pritchard's testimony were admissible under subsection (2) of section 90.803 as an excited utterance, the trial court did not abuse its discretion in admitting Pritchard's testimony.

II. Hearsay Statement about Theft of the Murder Weapon
In Hudson's second issue on appeal, he asserts that the trial court erred in allowing the prosecutor to elicit hearsay testimony from Hudson on cross-examination relating to the theft of the murder weapon, a handgun that had been stolen from Peller's apartment several months before the murder. The following colloquy occurred:
Q [Prosecutor] Where did you see that gun before, Lance's house?
A Yes, sir.
Q You know Lance's gun got stolen; right?
A Yes, sir.
Q No idea who stole that gun?
A I have ideas.
Q Do you know?
A Um
Q Do you know?
A Now I do.
Q Now you do? Who stole the gun?
A Ernesto Gonzalez.
Q How do you know that?
A Through reading discovery, his statement.
Q His statement? Ernesto Gonzalez admits to stealing that gun in his statement?
A He admits to burglarizing Lance's apartment.
Q With who?
Defense counsel objected at that point, but the trial court overruled the objection. The prosecutor then continued:
Q Ernesto Gonzalez admits to burglarizing that house with who?
A He claims it was with me.
Q With you?
A He claims it was with me, it wasn't.
Q Okay, but that's in his statement, too; right?
A Sure.
Defense counsel again objected that the question called for information that should not come before the jury and had nothing to do with the case, and moved for mistrial. The trial court stated that the question was a natural follow-up to Hudson's testimony and the motion for mistrial was denied.
As previously mentioned, the standard of review of a trial court's ruling on the admission of the evidence is abuse of discretion; however, that discretion is abused if the ruling is contrary to the rules of evidence. We will, therefore, determine if the out-of-court statement was properly admitted under the circumstances of this case.
In this case, the State was engaging in a legitimate area of cross-examination by asking Hudson if he knew who stole the *110 victim's gun, which was also the murder weapon. It was Hudson who volunteered that he knew that Gonzalez stole the gun because he read it in Gonzalez's discovery statement, in which Gonzalez admitted to burglarizing the victim's apartment and stealing the gun. No objection was made to that series of questions and it is indisputable that it was to Hudson's benefit to claim that Gonzalez, a confederate of Mejia, stole the gun. By Hudson's limited answer it is apparent that he wanted the jury to hear only that part of the hearsay statement implicating Gonzalez and not the second part implicating Hudson. It was only when the prosecutor was permitted to ask the question "with who" that Hudson admitted that the statement also implicated him in the burglary of Peller's apartment.
We agree with the State that in this case Hudson opened the door by volunteering Gonzalez's hearsay statement as the basis for his answer. Once only a portion of the statement was introduced and essentially presented an incomplete picture, it was fair for the State to follow up in order to clarify Hudson's response and make it complete. "[T]he concept of `opening the door' allows the admission of otherwise inadmissible testimony to `qualify, explain, or limit' testimony or evidence previously admitted." Lawrence v. State, 846 So.2d 440, 452 (Fla.2003) (quoting Rodriguez v. State, 753 So.2d 29, 42 (Fla. 2000)). "The concept of `opening the door' is `based on considerations of fairness and the truth-seeking function of a trial'" and without the fuller explication, the testimony that opened the door "would have been incomplete and misleading." Lawrence, 846 So.2d at 452; see also Overton v. State, 801 So.2d 877, 900-01 (Fla.2001) (agreeing that the State is permitted to fill in the gaps in the testimony to correct a false impression left by the defendant).
Here, the prosecutor's question that elicited the subject of Gonzalez's sworn statement did not clearly call for hearsay and was otherwise proper. Once Hudson opened the door by his answer and implied by his responses that Gonzalez alone stole the gun, thereby raising the inference that Gonzalez alone committed the murder, the prosecutor was entitled to elicit a full and fair account of the Gonzalez statement to clarify that impression. Therefore, we conclude that the trial court did not abuse its discretion in allowing the prosecutor to further question Hudson about Gonzalez's sworn statement in order to qualify or explain his earlier reference to the contents of the statement.

III. Comment on Hudson's Failure to Testify Against Others
At the conclusion of the guilt phase, the prosecutor argued in closing argument:
The Defendant also told detectives that he would accept the charges and that he's willing to spend the rest of his life in prison for what happened. The detectives are saying at the same time, why, why don't you tell us, why should that other guy get out there and be able to roam around free. Give us that guy you were on the phone with, who's calling the shots. Because the guy who pulled the trigger is the guy with the gun, we'd also like the guy who's on the phone, that's why our investigation continues, but we need someone to tell us who's on the phone and to testify.

(Emphasis supplied.) Defense counsel objected and moved for a mistrial, arguing this argument was an improper comment on Hudson's right to remain silent. Hudson contends that the comment suggested there was an ongoing investigation in which Hudson did not cooperate and that Hudson needed to testify about matters relating to that ongoing investigation. *111 The trial court found that the comment was proper and denied the motion for mistrial.
We agree that the argument of counsel was not an improper comment on Hudson's right to remain silent and not testify because the comment indicating that he refused to further implicate Mejia or be a witness against him was made after Hudson expressly waived his right to remain silent and freely conversed with police. See Hutchinson, 882 So.2d at 955 ("The prohibition against commenting on a defendant's silence does not apply when the defendant does not invoke his Fifth Amendment right."); Downs v. Moore, 801 So.2d 906, 911-12 (Fla.2001) (holding that the State is not precluded from admitting evidence of defendant's refusal to answer one question of many where defendant has not invoked his Fifth Amendment rights); Ragland v. State, 358 So.2d 100, 100 (Fla. 3d DCA 1978) (holding that where defendant waived his Fifth Amendment rights and freely and voluntarily conversed with police, comment on the failure to answer one question of many is not a violation of the defendant's right to remain silent).
In this case, Hudson did not maintain silence prior to trial, giving several interviews to detectives after waiving his rights, nor did he maintain silence at trial, instead taking the stand to testify. While claiming his own innocence in this case, Hudson fully explained his version of how Mejia directed him to kill Peller and offered him a gun, how Mejia refused to consider any other solution, and how Hudson did not follow through with the murder. While the time of the call was disputed, Hudson admitted calling Mejia to try to cancel the murder.
Because Hudson waived his right to remain silent, gave interviews to police, and testified at trial, he has not invoked his right to remain silent, and testimony concerning his reluctance to implicate Mejia further was not improper comment on his right not to testify. Moreover, the testimony and argument of counsel was fair comment on the evidence presented by both Detective Bukata and Hudson, and was made in the context of explaining why there was still an ongoing investigation in the casean issue highlighted by defense counsel several times. The prosecutor said: "Because the guy who pulled the trigger is the guy with the gun, we'd also like the guy who's on the phone, that's why our investigation continues, but we need someone to tell us who's on the phone and to testify." The prosecutor further explained:
That's why it's an ongoing investigation. There's more than one person involved in this, no question about it, but we need one [sic] someone to give us those other people. We know you, Russell Hudson, pulled the trigger and took Lance Peller's life, no doubt about it, but who sent you there and how do we prove who sent you there. That's the ongoing investigation.
The ongoing investigation had been made an issue in the case numerous times by the defense during cross-examination of the detectives and appeared aimed at suggesting to the jury that the detectives were not entirely sure Hudson committed the murder. Therefore, the trial court correctly concluded that the argument was not an improper comment on Hudson's failure to testify against Mejia, but was fair comment on the evidence presented. We agree and accordingly deny relief on this claim.

IV. Denial of Special Instruction on HAC
We now turn to the penalty phase issues. Before the penalty phase, Hudson sought a modification to the standard jury *112 instruction on the heinous, atrocious or cruel (HAC) aggravator that would have advised the jury that "[i]n determining whether the killing was especially heinous, atrocious, or cruel, you are considering only the effect defendant's actions had upon the victim, and not the effect the actions had upon other people who were present but were not killed." The State contended that the special instruction was not necessary because the standard jury instruction correctly covered the matter. The trial court denied Hudson's request for the special instruction.
"In order to be entitled to a special jury instruction, [the defendant] must prove: (1) the special instruction was supported by the evidence; (2) the standard instruction did not adequately cover the theory of the defense; and (3) the special instruction was a correct statement of the law and not misleading or confusing." Stephens v. State, 787 So.2d 747, 756 (Fla. 2001) (footnotes omitted). Hudson argues that the standard instruction is insufficient because it does not tell the jury not to consider the effect of the killing on others. We disagree. The standard jury instructions inform the jury that "[t]he aggravating circumstances that you may consider are limited to any of the following that are established by the evidence." Fla. Std. Jury Instr. (Crim.) 7.11 (emphasis supplied). This admonition precedes the discussion of the aggravating circumstances and acts as a limitation on what the jury may properly consider.
The standard instruction pertaining to HAC also advises the jury that "[t]he kind of crime intended to be included as heinous, atrocious or cruel is one accompanied by additional facts that show that the crime was conscienceless or pitiless and was unnecessarily torturous to the victim." Id. (emphasis supplied.) Hudson also suggests that the jury instruction given by the trial court, which stated that "[t]orturous murders are those that show extreme and outrageous depravity as exemplified by desire to inflict a high degree of pain or utter indifference to or enjoyment of the suffering of another," allows the jury to consider the suffering of someone other than the victim. However, this language was part of a special instruction expressly requested by Hudson. Therefore, Hudson cannot now be heard to complain that this particular instruction was confusing or incorrectly directed the jury to consider the suffering of anyone other than the victim.
Accordingly, because the special instruction was adequately covered within the standard jury instructions and the standard instructions adequately advised the jury to focus only on the effect of the defendant's actions on the murder victim, we conclude that the trial court did not abuse its discretion in denying Hudson's requested special instruction.

V. Claim of Fundamental Error in State's Argument on HAC
In a related argument regarding the HAC aggravator, Hudson claims fundamental error occurred in the penalty phase closing argument by the prosecutor. After reminding the jury that Hudson had begun to run around the apartment talking about people being outside who might kill them all, the prosecutor made the following arguments:
No one ever saw anybody outside. Why was he doing that to the people inside the apartment?
Could it be to make Jennifer and Lance Peller more nervous about what's going throughcould it be to make them suffer more about what's happening? Why would he go around saying that?
....

*113 And I'll submit to you the evidence shows that he tortured them mentally through this event; so much so that Lance Peller could not catch his breath, so much so he had to call his father and mother to say good-bye.
No objection was lodged to this argument. A short time later the prosecutor again discussed HAC, stating:

The minutes of anguish these folks are going through at that time, that's what we're talking about. That's what it's about.
You want to call your dad to say good-bye? Why not. Here is the phone.
That's what it's about. The kind of crime intended to include which heinous atrocious and cruel is one accompanied by additional facts to show the crime was conscienceless and pitiless and unnecessarily torturous to the victim.
(Emphasis supplied.) Again, no defense objection was lodged to that portion of the argument that referred to the anguish of "these folks" who were in the apartment.
These comments now complained of as fundamental error refer to the circumstances in the apartment during the time leading up to the murder, including the panic and fear experienced by both Peller and Fizzuoglio that were exacerbated by Hudson's statements that there were people outside who would kill them all. The prosecutor also noted that Peller's fear and distress were worsened by his concern for Fizzuoglio's safety. In the context in which they were given, the prosecutor's comments relate to Peller's perception of and reaction to his impending death, and do not appear to be improper.
The one questionable comment made by the prosecutor related to the effect on Peller's family. The prosecutor also argued:
Torturous murders are those that show extreme [and] outrageous depravit[y] as exemplified by desire to inflict a high degree of pain and orsee, folks, right there oror B the utter indifference to the enjoyment of the suffering of another. That's heinous and atrocious and cruel, the mental anguish that he put these folks throughLance Peller and his family.

That's the third aggravator of heinous, atrocious and cruel. They can say quick all they want with this one bullet, and it probably was and he said it was.
But I'm asking you to look beyond that, and look at the facts of him being there from 7:00 to 9:15, 9:20whenever that trigger was pulled.
(Emphasis supplied.) Hudson is correct that the prosecutor should not have asked the jury to consider the mental anguish of Peller's family. Because no objection was lodged, however, the unobjected-to comment would constitute reversible error only if it rises to the level of fundamental error. This Court explained in Walls v. State, 926 So.2d 1156 (Fla.2006), that in order for improper comments made in the closing arguments of a penalty phase to constitute fundamental error, they must be so prejudicial as to taint the jury's recommended sentence. Id. at 1176.
We do not consider this single isolated reference to the mental anguish of Peller's family "so prejudicial as to taint the jury's recommended sentence" and therefore rise to the level of fundamental error. Id.[8] In *114 this case, the comments were brief and isolated. Accordingly, we affirm on this point.

VI. Fizzuoglio's Testimony that Peller Knew He Was Going to Die
Hudson next argues that the trial court reversibly erred when it allowed Fizzuoglio to testify during the penalty phase that Peller knew he was going to die. This same testimony had come in during the guilt phase, but the trial court sustained defense counsel's objection at that time. Fizzuoglio testified again during the penalty phase and said that after Hudson pulled out the gun, Peller was scared and began to have what appeared to be an anxiety attack. She tried to calm him down but both of them remained anxious and frightened. She testified that after Hudson began talking about people being outside who would kill them, "Lance knew at that point he wasn't going to make it out of there alive." Counsel objected to this last statement but the objection was overruled and Fizzuoglio continued by testifying that Peller "knew that he wasn't going to make it out ... alive and he said can shelet her go, this has nothing to do with her." She testified that Peller was "freaking out" and hyperventilating, then asked for a phone to "call my father to say goodbye." Fizzuoglio testified that Hudson kicked the telephone over to Peller and he called his father and left a recorded message saying: "Hi Dad. It's your son. I love you. I just wanted to tell you and mom that I love you both much. I am about to die. I love you both. Bye."
In Shiver v. State, 564 So.2d 1158 (Fla. 1st DCA 1990), the court found testimony that the witness said the appellant "looked like he was going to get revenge on somebody" was admissible as describing "the witness's factual observation of appellant's mental state at the time." Id. at 1160. As a general rule, however, a witness should not testify in the form of opinion or inference, if the jury is just as capable of drawing those same inferences from the evidence. See Thorp v. State, 777 So.2d 385, 395-96 (Fla.2000).
Because Fizzuoglio's testimony went beyond simply describing her observations of Peller to speculate on what Peller was thinking or what he knew at that time, the trial court erred in allowing Fizzuoglio to testify that Peller knew he was going to die. However, her reference to what Peller knew was brief, and was based on testimony of her observations that the judge and jury also had before them for consideration and from which they could reasonably make the same inference. Fizzuoglio testified to Peller's panic upon seeing the gun and hearing that there were people outside who would kill them all. She heard him express concern about her safety, asking Hudson to let her go because she was not involved. She could see that Peller did not physically resist and, by his actions, appeared resigned to his fate. She heard him ask for a telephone to call his father to tell him goodbye. Fizzuoglio was subject to cross-examination on all her observations and on the basis of her characterization of Peller's reactions to the threat of his impending death. Therefore, we conclude that the error in admitting Fizzuoglio's testimony that Peller knew he was going to die was harmless beyond a reasonable doubt. See State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986) (stating that application of the harmless error test includes an "examination of the permissible evidence on which the jury could have legitimately relied"). Accordingly, we deny relief on this claim.

*115 VII. Trial Court's Finding of HAC and CCP, Weighing of Sentencing Circumstances, and Findings for Imposition of Death Penalty
Hudson challenges the trial court's findings of HAC and CCP, as well as its weighing of the sentencing circumstances. Hudson also argues that the trial court failed to make specific written findings required under section 921.141(3), Florida Statutes (2001), in order to impose a sentence of death. We conclude that there is no merit to these claims and will discuss each in turn.

A. Finding of HAC
Hudson first challenges the trial court's basis for finding that the murder was heinous, atrocious or cruel (HAC). In reviewing a trial court's finding of an aggravating circumstance, "this Court's task `is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding.'" Douglas v. State, 878 So.2d 1246, 1261 (Fla.2004) (quoting Willacy v. State, 696 So.2d 693, 695 (Fla.1997)).
We conclude that the trial court had before it competent, substantial evidence to support the finding of HAC. Hudson correctly argues that a fairly instantaneous death by single gunshot is often found not to be heinous, atrocious or cruel. We agree with Hudson that the death by gunshot here was essentially instantaneous, but we cannot ignore the evidence of the circumstances to which Peller was subjected leading up to his death, knowing in all likelihood that he was going to die. As we have observed, "fear, emotional strain, and terror of the victim during the events leading up to the murder may make an otherwise quick death especially heinous, atrocious, or cruel," James v. State, 695 So.2d 1229, 1235 (Fla.1997), including where the victim is acutely aware of his or her impending death. See Gore v. State, 706 So.2d 1328, 1335 (Fla.1997) ("[T]he fear and emotional strain of the victim from the events preceding the killing may contribute to its heinous nature."); see also Preston v. State, 607 So.2d 404, 410 (Fla.1992) ("Fear and emotional strain may be considered as contributing to the heinous nature of the murder, even where the victim's death was almost instantaneous.").
In the instant case, the evidence upon which the trial court relied establishes that Peller knew of his impending death for a significant period of time preceding his murder. Hudson was actually present with a gun, which he pulled at least forty-five minutes before the murder. Once Hudson pulled the gun, the evidence established that Peller was scared and hyperventilating. Certainly Peller's call to his father shows acute awareness of his impending death. Fizzuoglio's observations and testimony regarding Hudson's actions and Peller's reactions, including his panic and fear, support the trial court's finding of HAC. Therefore, no relief is warranted on this claim.

B. Finding of CCP
"In order to find the CCP aggravating factor, the jury must determine that the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated); that the defendant exhibited heightened premeditation (premeditated); and that the defendant had no pretense of moral or legal justification." Franklin v. State, 965 So.2d 79, 98 (Fla.2007) (citing Jackson v. State, 648 So.2d 85, 89 (Fla. 1994)). It is the State's burden to prove CCP beyond a reasonable doubt. See *116 Walker v. State, 957 So.2d 560, 581 (Fla. 2007).
A determination of whether CCP is present is properly based on a consideration of the totality of the circumstances. Wike v. State, 698 So.2d 817, 823 (Fla.1997); see also Lynch v. State, 841 So.2d 362, 372 (Fla.2003). "[T]he facts supporting CCP must focus on the manner in which the crime was executed, e.g., advance procurement of weapon, lack of provocation, killing carried out as a matter of course." Lynch, 841 So.2d at 372 (quoting Looney v. State, 803 So.2d 656, 678 (Fla.2001)). In this case, the trial court's finding of CCP included the fact that Hudson took a loaded firearm to the apartment; he discussed the impending murder with Peller for a substantial period of time; Peller offered no resistance and was shot in the head execution-style; and the murder was not spontaneous or impulsive. The trial court found the murder involved heightened premeditation over and above what is required for unaggravated first-degree murder, noting that the degree of ruthlessness is evident in the fact that Hudson let Peller use the telephone to call his father to say goodbye and then shot the unarmed, unresisting victim in the head. Hudson informed Peller that he had been sent there to kill him, evidencing a prearranged plan. The trial court correctly concluded there was no pretense of moral or legal justification.
It is significant that Hudson was in the apartment for at least forty-five minutes before the shooting. Even though Hudson may have agonized over the final act and tried to get out of the shooting by calling someone, he clearly had "ample opportunity" to reflect upon his actions, following which he decided to shoot Peller execution-style. Id. at 371 (quoting Looney, 803 So.2d at 678). Heightened premeditation necessary for CCP is established where, as here, the defendant had ample opportunity to release the victim but instead, after substantial reflection, "acted out the plan [he] had conceived during the extended period in which [the] events occurred." Alston v. State, 723 So.2d 148, 162 (Fla.1998) (quoting Jackson v. State, 704 So.2d 500, 505 (Fla.1997)); see also Looney, 803 So.2d at 679. This evidence alone would be sufficient to establish heightened premeditation, but coupled with the facts that Peller's murder had been planned weeks in advance and that Hudson took the murder weapon to the scene, heightened premeditation is clearly proven.
The evidence was also sufficient to support the trial court's finding that the murder was calculated. Hudson calculated and prepared in advance to shoot Peller and took the loaded murder weapon to the apartment where he found Peller alone. The shooting was not done in a fit of rage but according to a prearranged plan, and the evidence clearly established that it was also "cold." The fact that Hudson did not immediately kill Peller does not make the murder less cold, calculated or premeditated. In the end, Hudson picked up a blanket to muffle the shot and killed Peller with a single gunshot to the head.
The trial court recognized and applied the correct rule of law and had before it competent, substantial evidence to conclude that the cold, calculated and premeditated (CCP) aggravator was present. Accordingly, this claim is without merit.

C. Weighing of Sentencing Circumstances and Findings
Hudson contends that the trial court erred in its assignment of weight to the aggravating and mitigating circumstances that it found. We disagree. The trial court entered a detailed sentencing *117 order outlining the evidence upon which the aggravating and mitigating circumstances were found. The judge also explained in detail why no statutory mitigation had been established. Nonstatutory mitigation was found in the sentencing order, but as explained by the trial court, was given little weight. The record supports these findings.
Dr. Kramer testified hypothetically about the effect that adolescent sexual abuse and parental abandonment could have on a person. However, he did not examine Hudson and did not connect the evidence of sexual abuse and abandonment in Hudson's past to the murder or to Hudson's actions or motivations in the case. The evidence, including portions of Hudson's own testimony, suggested that the murder was business-related and not personal or the result of rage or any other mental condition. The rejection of statutory mitigators is supported by the record, and the trial court's findings and weight given to the many nonstatutory mitigators found is both reasoned and supported. The trial judge correctly weighed the aggravators it found against the mitigators proven by the evidence and we will not reweigh the sentencing circumstances in this appeal. See Rodgers v. State, 948 So.2d 655, 669 (Fla.2006), cert. denied, ___ U.S. ___, 128 S.Ct. 59, 169 L.Ed.2d 50 (2007). No error has been shown in either the rejection of the statutory mitigators or in the weighing of the nonstatutory mitigators.
Hudson also contends that the trial court failed to make the specific written findings required under section 921.141(3), Florida Statutes (2001), expressly stating that sufficient aggravating circumstances exist and that there are insufficient mitigating circumstances to outweigh the aggravating circumstances. This precise claim was found to be without merit in Williams v. State, 967 So.2d 735, 761 (Fla. 2007) (citing Holmes v. State, 374 So.2d 944, 950 (Fla.1979)), and we reject it here. We said in Holmes that "[t]here is no prescribed form for the order containing the findings of mitigating and aggravating circumstances.... It must appear that the sentence imposed was the result of reasoned judgment." 374 So.2d at 950.
In this case, the trial judge entered a detailed sentencing order in which he stated the applicable law and made specific findings of fact as to each aggravator and mitigator. The sentencing order stated that statutory aggravators were found, that no statutory mitigators were found, that twelve nonstatutory mitigators were established, and that the aggravators "far outweigh the mitigators." The court also found that the aggravators were "overwhelming." This sentencing order "was the result of reasoned judgment," id., and meets the requirements of the statute under the analysis set forth in Williams and Holmes. Thus, we deny relief on this claim.

VIII. Constitutional Challenge to Capital Sentencing
Hudson challenges the constitutionality of section 921.141, Florida Statutes (2001), based on Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Hudson's Ring claim fails because the evidence established that he had a prior violent felony convictionthe second-degree murder conviction that he incurred as a juvenile and he was convicted by a unanimous jury of the contemporaneous kidnapping of Fizzuoglio in this case. See Johnson v. State, 969 So.2d 938, 961 (Fla.2007) (holding that relief is not available under Ring where one of the aggravators rests on the separate conviction for kidnapping, which satisfies Sixth Amendment requirements), *118 cert. denied, ___ U.S. ___, 128 S.Ct. 2056, 170 L.Ed.2d 2056 (2008); Bryant v. State, 901 So.2d 810, 823 (Fla.2005) (holding that Ring does not apply where one of the aggravating circumstances is a prior violent felony). The "prior violent felony conviction alone satisfies constitutional mandates because the conviction was heard by a jury and determined beyond a reasonable doubt." Id. (quoting Johnston v. State, 863 So.2d 271, 286 (Fla.2003)).
Hudson also claims that his death sentence is unconstitutional because it results from a sentencing scheme that does not properly narrow the class of death-eligible defendants, in violation of Furman. "[T]his Court has `rejected the claim that the death penalty system is unconstitutional as being arbitrary and capricious because it fails to limit the class of persons eligible for the death penalty.'" Williams, 967 So.2d at 767 (quoting Miller v. State, 926 So.2d 1243, 1260 (Fla.2006)); see also Lugo v. State, 845 So.2d 74, 119 (Fla.2003). This Court has held that Florida's capital sentencing scheme is constitutional in this regard because "[a] capital sentencing scheme passes constitutional muster if it rationally narrows the class of death-eligible defendants and permits the sentencer to consider any mitigating evidence relevant to its determination." Johnson, 969 So.2d at 962 (citing Kansas v. Marsh, 548 U.S. 163, 175, 126 S.Ct. 2516, 165 L.Ed.2d 429 (2006)). Johnson also noted that "the channeled discretion required by the Eighth Amendment is provided by Florida's scheme requiring statutory and mitigating circumstances to be found and weighed first by the advisory jury and then independently by the trial court." Id. (citing Proffitt v. Florida, 428 U.S. 242, 248-52, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976)). Because the Court has previously addressed all the constitutional claims raised by Hudson and found them to be without merit, relief will not be granted on these claims.

IX. Sufficiency of the Evidence
Hudson has not challenged the sufficiency of the evidence. This Court, however, has a mandatory obligation to review the sufficiency of the evidence in every case in which a sentence of death has been imposed. Jones v. State, 963 So.2d 180, 184 (Fla.2007). In this case, the State presented eyewitness testimony by Jennifer Fizzuoglio, whom Hudson was also convicted of kidnapping, establishing that when she arrived at the apartment, Hudson was there and that he pulled out a handgun and held both her and Peller at gunpoint for an extended period of time. She saw Hudson pick up the blanket and enter the bathroom where Peller was sitting on the floor. Fizzuoglio heard one shot and Peller was then dead. She testified that no one else was in the apartment at the time.
Fizzuoglio also testified that Hudson forced her at gunpoint to leave with him in her car. The State also proved that Hudson's DNA was on the steering wheel of Fizzuoglio's red Mustang. The car was left with the engine running near the First Presbyterian Church, which is very close to the Dairy Queen where Hudson was picked up by his friend on the night of the murder. The murder weapon was found some months later buried in a flower bed at the First Presbyterian Church.
Hudson also gave statements to police, not challenged on appeal, in which he admitted that he was being pressured to kill Peller, although he denies having done so. Hudson's roommate testified that about a month before the murder, he saw Hudson in possession of a handgun that looked like the murder weapon. A bullet that was capable of being fired by the murder weapon was found in the side pocket of Hudson's car the day after the murder. *119 Hudson had Peller's credit cards and driver's license in his possession when he was arrested and had used the credit card for a purchase the day after the murder. He also had Fizzuoglio's driver's license in his possession. John Coyne, an acquaintance of Hudson's, testified that Hudson admitted committing the murder in a telephone conversation they had while Hudson was in jail. We conclude that the evidence against Hudson was legally sufficient to support his first-degree murder conviction.

X. Proportionality of the Death Sentence
In all cases in which a sentence of death has been imposed, we must also review that sentence for proportionality. In the sentencing order entered below, the trial court found four statutory aggravators: (1) a previous conviction for a felony involving violence (second-degree murder as a juvenile); (2) the contemporaneous conviction of a felony involving use or threat of violence (the contemporaneous armed kidnapping); (3) the murder was heinous, atrocious, or cruel (HAC); and (4) the murder was cold, calculated and premeditated (CCP).[9] Each of the aggravating circumstances was accorded great weight. The trial court found no statutory mitigators but found twelve nonstatutory mitigators, which were accorded little weight.[10] The trial court found that Hudson had not proven that he had a history of drug addiction and Attention Deficit Disorder or that he had an extensive history of sexual abuse.
In Walker v. State, 957 So.2d 560 (Fla. 2007), this Court found the death sentence proportional where, as here, the case involved an execution-style murder and a kidnapping, findings of HAC and CCP, and four nonstatutory mitigators to which the trial judge assigned little to moderate weight. Id. at 585. In Floyd v. State, 913 So.2d 564, 573 (Fla.2005), an execution-style murder in which Floyd shot the victim in the head, the trial court found three aggravating circumstancesthat the murder was committed while Floyd was under sentence of imprisonment, prior violent felony conviction, and that the murder was committed in the course of a kidnapping as well as one statutory mitigator and several nonstatutory mitigators. Id. at 578. We held there that the death sentence was proportional when considered in relation to other death sentences the Court has upheld. Id. at 578-79.
In this case, Hudson's four weighty aggravatorsHAC, CCP, prior violent felony conviction, and the contemporaneous kidnapping of a separate victimfar outweigh the minimal mitigation. Accordingly, we find that the death sentence imposed in this case is proportionate.

CONCLUSION
After a thorough review of all the issues raised by Hudson, and after our own independent *120 review of the evidence and the sentence, we affirm Hudson's convictions for first-degree murder and the sentence of death. We also affirm his conviction for armed kidnapping and the sentence imposed for that offense.
It is so ordered.
WELLS, ANSTEAD, PARIENTE, LEWIS, CANTERO, and BELL, JJ., concur.
QUINCE, C.J., concurs in result only.
NOTES
[1] Shortly after the investigation began in this case, an inquiry by detectives to the Immigration and Naturalization Service resulted in Mejia's deportation. At the time of Hudson's trial, Mejia had not returned and had not been charged with a crime in the case. Nor had Justin Dilger, whom Hudson also implicated, been charged at the time of trial, although Detective Glen Bukata testified that he filed probable cause affidavits pertaining to their suspected involvement in bringing about the death of Lance Peller.
[2] Evidence that the call was made, and the time of the call, was presented during the guilt phase but the actual words of the message were not presented until the penalty phase of the trial.
[3] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[4] The trial court found four aggravators and assigned great weight to each: (1) prior violent felony based on the prior conviction for second-degree murder; (2) prior violent felony based on the contemporaneous armed kidnapping of Fizzuoglio; (3) the murder was heinous, atrocious, or cruel (HAC); and (4) the murder was cold, calculated, and premeditated (CCP). The trial court found no statutory mitigation, rejecting Hudson's age of thirty-two and his claim that he acted under extreme duress or substantial domination of Felipe Mejia as mitigating circumstances. The trial court found twelve nonstatutory mitigators and assigned little weight to each: (1) abandonment by his birth mother; (2) mental abuse by his stepmother; (3) history of substance abuse; (4) limitations on contact with his siblings; (5) inappropriate sexual contact as an adolescent; (6) he was a good prisoner; (7) his ability to excel at work; (8) he cares for others; (9) his positive relationships with others; (10) his good courtroom behavior; (11) his ability with computers; and (12) his use of drugs during the crime. The trial court found that Hudson had not proven a history of drug addiction, attention deficit disorder (ADD), or an extensive history of sexual abuse.
[5] The claims raised are: (1) error in admission of hearsay testimony of phone call from Peller to Pritchard; (2) error in allowing Gonzalez's out-of-court statement that Hudson stole Peller's gun; (3) error in allowing the State to comment on Hudson's failure to testify against others; (4) error in denying request for special instruction on the HAC aggravator; (5) fundamental error in State's jury argument on HAC; (6) error in allowing Fizzuoglio's testimony that Peller knew he was going to die; (7) error in finding HAC; (8) error in finding CCP; (9) error in weighing of sentencing circumstances; (10) failure of judge to make findings required for the death penalty; and (11) unconstitutionality of the death penalty statute under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), or Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).
[6] Detective Brad Libman testified that in the interview with detectives on October 31, 2001, Hudson discussed the fact that Peller was involved in bonding Hudson out of jail in the past.
[7] We need not address the admissibility of the statements under the spontaneous statement exception contained in section 90.803(1) because we conclude they were admissible under section 90.803(2).
[8] "In determining whether fundamental error has occurred where improper comments are not objected to, this Court examines the totality of the alleged errors" in the closing argument. Brown v. State, 846 So.2d 1114, 1127 (Fla.2003) (citing Card v. State, 803 So.2d 613, 622 (Fla.2001)). However, Hudson has not identified any preserved error in closing argument that would be included for consideration in conjunction with the unpreserved claims.
[9] Both (1) and (2) were found based on section 921.141(5)(b), Florida Statutes (2001). Hudson does not challenge the trial court's finding of two separate aggravating circumstances based on the same statutory subsection. However, because the record shows that the murder was committed in the course of a kidnapping, which qualifies as a separate aggravator under section 921.141(5)(d), the aggravating circumstance set out in (2) is supported. Therefore, the total number of statutory aggravators found by the trial court was not erroneous.
[10] The nonstatutory mitigators found were: (1) Hudson's abandonment by his birth mother; (2) mental abuse by stepmother; (3) history of substance abuse; (4) limitations on contact with his siblings; (5) inappropriate sexual contact as an adolescent; (6) good prisoner; (7) ability to excel at work; (8) cares for others; (9) positive relationships with others; (10) good courtroom behavior; (11) ability to use computers; and (12) use of drugs during crime.